IN THE

# COURT OF ERRORS AND APPEALS

OF THE STATE OF NEW JERSEY,

ON APPEAL FROM THE COURT OF CHANCERY,

JULY TERM, 1879.

---

THE MAYOR AND ALDERMEN OF JERSEY CITY, appellants,

*v.*

HENRY LEMBECK, respondent.

1. Chancery has no jurisdiction, in the absence of specific equities, over the assessment made in the course of municipal improvements.

2. The act "to compel the determination of claims to real estate in certain cases, and to quiet the title to the same," does not warrant the filing of a bill to contest the legality of such assessment, on the ground of its being an encumbrance on land.

3. The right to superintend the making of such assessments, is a common law right vested in the supreme court by the constitution, and such power cannot be transferred, by legislation, to the court of chancery.

4. The true construction of this act indicated.

---

On appeal from a decree of the chancellor, whose opinion is reported in *Lembeck* v. *Jersey City, 3 Stew. 554.*

The case made in the bill and answer was this: Certain assessments had been made for municipal improvements in

Jersey City, which, it was alleged, were an apparent lien on the property of the respondent. By an act approved the 26th of March, 1873, entitled "an act to adjust unpaid assessments in Jersey City," the supreme court was authorized to appoint commissioners with power to examine and revise, alter and adjust all unpaid assessments that had been made within a certain period; and that the commissioners so appointed acted on said assessments, and made final reports, confirming some of them and modifying others. The bill alleged that such assessments were an encumbrance on certain lands, the property of the respondent, and that the "final reports of the commissioners do not show that the property is not assessed in excess of the benefits received by said improvements for which said assessments were made." The prayer of the bill was, that the appellant might specify its claim or encumbrance upon said lands, and how and by what instrument the same was derived or created, and that it might be settled and adjudged whether the defendant had any estate, interest or right in, or encumbrance upon, said lands, &c.

*Mr. Abbett,* for appellant.

*Messrs. Collins & Corbin,* for respondent.

The lands in question are lots 42 and 44 Communipaw avenue, in block 523, in Jersey City. Prior to August 10th, 1876, Sebastian Goehner owned this property for several years. It was sold by the sheriff, and he afterwards executed a quit-claim deed for it. Henry Lembeck obtained title to this property by a deed from Patrick H. Laverty, sheriff, to him, dated August 10th, 1876 (recorded *liber 302, p. 306*), and by a quit-claim deed from Sebastian Goehner and wife to him, dated August 11th, 1876 (recorded *liber 303, p. 179*). Sebastian Goehner "owned the property while the improvements in question were made, and long before that."

January 5th, 1872, the board of works of Jersey City confirmed, and the mayor approved, an assessment for the widening of Grand street and the Newark and New York plank-road from Ocean to Bergen avenue. This assessment on the lots in question was $189.26. This assessment was reviewed by the commissioners appointed by the supreme court under the act of March 26th, 1873, entitled, "An act to adjust unpaid assessments in Jersey City." The new commissioners determined and adjudged that the reasonable and fair cost of this improvement was $14,791.97, and confirmed the original assessment of January 5th, 1872. They thought the old assessment right, and so determined.

March 17th, 1871, an assessment was made for Nicholson pavement on West Grand street and Newark plank-road. This assessment on the lots in question was $435.20. This assessment was reviewed by the new commissioners under act of March 26th, 1873. The new commissioners determined and adjudged that the reasonable and fair cost of this improvement was $173,375.37, and confirmed the original assessment of March 17th, 1871. They thought the old assessment was right, and so determined.

August 17th, 1871, an assessment was made for a sewer in Bergen avenue, from Franklin street to Lexington avenue &c. This first assessment was $4,421.80 more than the re-assessment, which was afterwards made by the new commissioners, under the act of 1873. The new commissioners put that amount on the city to be paid by taxation. The reduced new assessment on the lots in question was $403.13. The board in this case complied with all the provisions of the act of 1873, specifically (Case p. 10). The only alleged defect is a neglect to state, affirmatively, in their report, that the property is not assessed in excess of the benefits received by the improvement for which the assessment was made, this defect being predicated upon the authority of the Passaic Case, 8 Vr. 538.

July 12th, 1872, an assessment was made for a main sewer in section A, in the second drainage district. The new

17

commissioners only assessed $238,217.01, and imposed upon the city $128,270.69 to be raised by tax, which last amount had been assessed, by the old assessment, on private property. The re-assessment was, therefore, a reduction of $128,270.69. The board in this case complied with all the provisions of the act of 1873, specifically (*Case pp. 6, 7*). The only alleged defect was that stated in the last paragraph, arising under *Passaic Case, 8 Vr. 538.*

*Mr. Leon Abbett,* for appellants.

I. The chancellor decided this case upon the authority of *Bogert* v. *City of Elizabeth, 12 C. E. Gr. 568.* The present case is, however, I submit, different from that. The Bogert case related to an assessment founded upon the charter of the city of Elizabeth. The provision of this charter was unconstitutional, because it assessed the whole amount of the cost and expenses on the land, instead of assessing only the amount benefited. The court held that all the proceedings were a nullity. The court says (*p. 572*) : " The complainant was not bound to remove these proceedings by *certiorari;* they were absolutely void, from beginning to end, and he had a right so to treat them; they could not grow, by lapse of time, into a right. The city can gain nothing by retaining the shadow of a right under sale; if retained for half a century, it would be nothing but a shadow still. It is, therefore, a gratuitous injury to the complainant."

II. The present case consists in a re-assessment made under an act "to adjust unpaid assessments in Jersey City," approved March 26th, 1873 (*P. L. 1873, p. 442*). Under a decision of this court in the case of *State, Morris* v. *Jersey City,* the supreme court held that re-assessments made under this act of March 26th, 1873, could be set aside on *certiorari,* where the reports were like those on pages 8 and 9 of the case. In this case the commissioners confirmed the old assessment. The supreme court, in the case of *State, Hal-*

*liard* v. *Jersey City* (not reported, but the opinion delivered, orally, by Justice Dixon), upheld assessments made by these commissioners where the reports were in the form of those found upon pages 6 and 10 of the case. In these cases, the commissioners, having considered the matter specifically, assessed back a part of the costs upon the city.

III. I submit that the language of the act of March 26th, 1873, contains expressions which can be fairly intended to imply that the re-assessments authorized were to be restricted in amount, so as to be commensurate with the charge imposed upon the particular land, and that, there-fore, under the case of *Passaic* v. *State, 8 Vr. 538*, this grant of power to the new commissioners, under the act of 1873, to re-assess, will be sustained; and that, under the case of *State, Halliard* v. *Jersey City*, the court will presume that these commissioners did not assess in excess of the benefits received by the said improvements for which said assess-ments were made. If this view is correct, two of the assessments which have been set aside by the chancellor would be good, to wit, the assessment for a main sewer in section A, second drainage district, and the assessment for a sewer in the Newark plank-road, being those mentioned in the reports on pages 6 and 10 of the case; and that, as to these two assessments, they were valid liens upon the prop-erty of Mr. Lembeck.

IV. In reference to the two assessments which, under the authority of *State, Morris* v. *Jersey City, 11 Vr. 485*, would be set aside, on *certiorari*, by the supreme court, I submit that the owner of the property should be compelled to proceed, by *certiorari*, to set aside these assessments; that the act "to compel the determination of claims to real estate in certain cases, and to quiet title to the same" (*Rev. p. 1189*), was not intended to apply to those cases where there could be a valid assess-ment and there had been merely a mistake of the commis-sioners; that that act, so far as assessments were concerned, was intended to reach a case like that of *Bogert* v. *City of*

*Elizabeth,* where the whole proceeding was a nullity. If the court adopt any other construction, do they not deprive Jersey City of the power to have these assessments reviewed on *certiorari?* Can the city *certiorari* these assessments?

*P. L. 1877, p. 174 ch. 116,* whilst authorizing municipal bodies to set aside certain assessments and order new ones, expressly says, that the act shall not authorize any assessment to be set aside which was made under "An act to adjust unpaid assessments in Jersey City." Is it the intention of the act to quiet title, that the city should be deprived of a substantial right, to wit, the right of re-assessment? Sebastian Goehner (*Case p. 14*) testifies, "the lots would have sold for more than $200 more on account of the improvement." This witness (for Mr. Lembeck), therefore, shows there ought to be some assessment upon these lots. And under the case of *State, Youngster* v. *Paterson, 11 Vr. 244,* the court will rely upon the judgment of the commissioners as to what the proper amount of assessment is, rather than upon the vague guesses of witnesses.

V. The act entitled "An act to compel the determination of claims to real estate in certain cases, and to quiet title to the same," was passed March 2d, 1870. (*P. L. 1870, p. 20.*) Three years after, on the 26th of March, 1873, the legislature passed an " act to adjust unpaid assessments in Jersey City," and the fifth section of that act provides that, when any assessment has been adjusted or confirmed by said board, it shall be, and is thereby declared to be, a new assessment, "and shall be final and conclusive as so re-adjusted, re-assessed or confirmed by said board upon all parties."

This section, then, provides for pending cases in *certiorari* being reviewed by said board, directing that no further proceeding shall be had under them; and the third section of the same act provides, "and any person or persons neglecting or refusing to apply to said board for relief from assessments, within such time as said board shall limit, not less

Jersey City v. Lembeck.

than thirty days and not more than sixty days, shall be considered as waiving all objections thereto."

The admission (*Case p. 17*) shows that advertisements were made by the commissioners, and a day fixed for a hearing, and a hearing was had wherever parties appeared in the cases in question, and that the commissioners acted upon these four cases as set forth in their reports annexed to the answer. As the act to adjust these unpaid assessments was passed three years after the act to quiet title, will not a fair construction of the act of 1870 be that it is subject to the provisions of the act of 1873, which made the assessments of these supreme court commissioners "final and conclusive, as re-adjusted, re-assessed or confirmed by said board, upon all parties?" If the act of 1870 is thus limited not to include the cases provided for in the act of 1873, then the chancellor was wrong in holding that, under the act of 1870, he had power to deal with these assessments thus made "final and conclusive" under the act of 1873.

*Messrs. Collins & Corbin*, for respondent.

I. If the assessments set up by the appellant (defendant) were invalid, the power and duty of the chancellor to make the decree appealed from are unquestionable in this court. *Bogert* v. *City of Elizabeth, 12 C. E. Gr. 568.*

II. The assessments were invalid. They were of two classes: (*a*) In one class, the commissioners appointed under the act of 1873 (*P. L. 1873, p. 442*), simply *confirmed* assessments previously made by the municipality. (See the reports of said commissioners, pp. 8, 9, printed case.) This they had no power to do. They were obliged, under the act, to exercise an independent, original judgment. This is the plain language of the act, and the supreme court has so held. *State, Morris* v. *Jersey City, 11 Vr. 485.* The appellant cannot be helped by resorting to the original assessments, for, first, they were not proved in the case;

second, they could not be found to be proved (see *Case pp. 18, 19*); and, lastly, as to the one confirmed by the report on page 8 of the printed case, while the law under which it was made (*P. L. 1871, p. 1143 et seq. § 41*) may be constitutional (though we doubt it), it is notorious that all assessments made in Jersey City at that time (1872) had the vice condemned in *8 Vr. 538*, cited below; and, as to the other, confirmed by the report on page 9 of the printed case, the law under which it was made (*P. L. 1870, p. 1211, § 84*) was clearly unconstitutional under the *Agens Case*. (*b*) In the other class, the said commissioners, acting *de novo*, themselves made invalid assessments (see their reports pp. 6 and 10 of the printed case). These assessments are void under the adjudged cases in this court, because they do not show affirmatively that the assessment made does not exceed the benefits. *Passaic* v. *State, Del. Lack. & West. R. R. Co., 8 Vr. 538.*

The original assessment (not proved) doubtless had the same defect, and, moreover, was made under an unconstitutional law. (*P. L. 1871, p. 1122 § 59, p. 1118 § 47.*)

The opinion of the court was delivered by

BEASLEY, C. J.

Upon looking into the pleadings in this case, it appears that the chancellor had before him the proceedings of certain commissioners, with respect to sundry municipal assessments, and that, after examining them, he annulled them by his decree, so far as relates to the land on which they were an apparent lien. The case is bare of all jurisdictional facts, except two, viz., that the assessments in question were not in litigation, and that they were ostensible encumbrances on lands owned by the complainant, and of which he was in possession. Neither fraud, nor oppression, nor other inequity, on the part of the defendant, was alleged, nor was it pretended that the commissioners, whose conduct was overhauled, were acting in the absence of due statutory

Jersey City *v.* Lembeck.

authority.   The defect on which the decree to vacate this taxation was founded, was that the commissioners omitted to show in their report an incident essential to its validity; that is to say, they did not state that " the amounts assessed on the property owners for benefits were not beyond the amount of the benefits received." It appears, therefore, that what was done in the court of chancery was this: A supervision was exercised over special officers performing a purely legal function, and that this bill has discharged, in part, the office, and nothing but the office, of a writ of *certiorari* at common law.   The question is, whether such a power exists ?

There is but one title claimed in favor of such an authority, and that is the act to be found on page 1189 of the *Revision*, entitled " an act to compel the determination of claims to real estate in certain cases, and to quiet the title to the same."   The general object of this statute is stated in the first clause of the first section, which is in these words:   " That when any person is in peaceable possession of lands in this state, claiming to own the same, and his title thereto, or to any part thereof, is denied or disputed, or any person claims, or is claimed, to own the same, or any part thereof, or any interest therein, or to hold any lien or encumbrance thereon, and no suit shall be pending to enforce or test the validity of such title, claim or encumbrance, it shall be lawful for such person so in possession to bring and maintain a suit in chancery to settle the title of said lands, and to clear up all doubts and disputes concerning the same, &c."

From this recital, it appears that the language of this provision is as comprehensive as it well could be, and that if such act is to be regarded as a thing standing by itself, and is to be interpreted by the force of its terms alone, it will seemingly confer the power that has been exercised in this case.   But statutes do not stand in such a state of disconnection; each one is but a part of the general polity, and is to be construed with reference to general principles and

laws, and in subordination to constitutional restrictions. It is in this wise that the will of the law-maker, and the reason and spirit of the enactment are ascertained, and by the use of this method with regard to this statute, all persons will agree, unless I greatly err, that it cannot have the scope that its language, if read by the letter, would seem to indicate, for, enforced in such sense, its control would cover so vast a field that it is quite out of the question to suppose such a result was within the legislative scheme.   Giving to these statutory expressions their full, inherent signification, it is, perhaps, not too much to say that almost every conceivable interest in, and right to, land, and every lien and encumbrance upon it, held or claimed by a person out of possession, could be, at the option of the party in possession, placed under the cognizance of a court of equity.   It will be sufficient to hint at the innumerable cases to which this power would extend, by specially referring to a few examples.   Whenever the possessor of lands should be apprehensive that an ejectment was about to be brought against him, he could forestall such proceeding by exhibiting a bill in chancery, and, in the absence of all particular equity, have the legal title of his adversary examined by that court, and, if need be, annulled.   So a tenant, in case his landlord should claim any reserved interest in the leased premises, might take a similar course.   And there seems nothing to forbid the idea that, under the prevalence of such a power, every case provided for by summary proceedings before a justice of the peace, under the landlord and tenant act, would be within the grasp of the equitable cognizance. Every judgment, every proceeding to lay out a public road, every mechanics lien, every exercise of the right of eminent domain, all these, and the vast mass of analogous procedures, could be brought under the control of the chancellor, and, if a fatal mistake or error should be manifested in any of them, such defective procedures could be avoided by his order.   In a word, it seems undeniable that, by force of a statutory interpretation that will support this bill, very

much of the authority of the common law courts, which is exercisable by means of writs of error, *certioraris* and actions of ejectment, would be participated in, to a large extent, by the court of chancery. I cannot think that it was the design of the legislature to confound, in this extraordinary degree, the well-defined boundaries of these several jurisdictions.

But, beyond this, I further am of opinion that, if such legislative design existed and has taken form and substance in this act, nevertheless, the endeavor to carry such purpose into effect must prove entirely abortive. In this state, the higher courts of common law, as well as the court of chancery, are constitutional tribunals, and that means, that their essential powers and attributes cannot be affected by legislation. The constitution has made each what it is, and such as it was made it must be and remain until destroyed or modified by the hand by which it was established. It is hardly necessary to say that, to impart to a court of conscience any of the ordinary common law powers, would be to effect a radical change in both tribunals, and that the same consequence would follow from the transfer to a court of law, of any matters of equitable cognizance. The various provisions of the constitution itself plainly negative the legislative right to interchange at pleasure the powers which inhere, by virtue of their primary organizations, in the various courts. By the original constitution of this state, the supreme court and the court of chancery were continued in existence, and it was thereupon immediately declared, by statute, that they should respectively be invested with the powers theretofore possessed by them; and, by the constitution of 1844, it was ordained " that the several courts of law and equity, except as herein otherwise provided, shall continue, with the like powers and jurisdiction, as if this constitution had not been adopted." It is plain, and has always been considered plain, that these organic provisions define with exactness the judicial institutions to which they are applicable. By force of them, the court of chancery has ever been deemed exclusively clothed with all those high

and ample prerogatives and authorities which, in imitation of its English type, it had exercised ever since its introduction into our jurisprudence, and, in the same way, the powers and franchises of the supreme court were, in all essential respects, thought to be modeled after the usage and measure of the king's bench; and the jurisdictions of these tribunals were as separate, as defined, and as respectively exclusive, as were the jurisdictions of those venerable institutions, to which, in structure and power, they are so nearly allied, and which they so closely resemble.

That the jurisdictional boundaries of these courts were considered to be completely settled, appears by many judicial declarations and resolutions; and that the powers of the one could not be transferred to the other, is manifest from the constitution itself, and not only from its general tenor, but also from a particular indication, for, in that instrument, by paragraph 10, section VII, article IV, it is declared " that the legislature may vest in the circuit courts, or courts of common pleas, within the several counties of this state, chancery powers, so far as relates to the foreclosure of mortgages and the sale of mortgaged premises," a provision that is entirely nugatory and superfluous, in the theory that the functions of these judicial bodies were subject to legislative transference. I can see nothing in the frame of our legal system, in the history of our jurisprudence, in our practice, or in the opinions of our own jurists, that does not wear the semblance of repudiating all claim of a legislative competency to confer a purely legal faculty on the court of chancery, or a purely equitable faculty on a court of common law. The fact is, that the inability of the legislature in this particular is so clear that it cannot be denied, without an admission of the solecism that the legislature can altogether abolish any one of these constitutional tribunals, because if one essential power of such a tribunal can be handed over to another, so may all its essential powers—a proposition so exorbitant that, it is presumed, no one will venture to maintain it. Neither will it be gain-

Jersey City *v.* Lembeck.

said that it is, and always has been, one of the prerogatives of the supreme court of this state to supervise the proceedings and to correct the errors of all inferior tribunals, and of persons and bodies exercising particular legal functions; the practice is so fixed and the adjudications so clear upon the point, that it would be a mere waste of time to do more than state it as an *admission.* And the principal mode in which this power is put forth, is by the effective and comprehensive writ of *certiorari.* In the case under review, the officers, whose acts have been set aside, were employed in a matter which was, from first to last, of a purely legal nature. From the time of the first introduction of magistracy into this state, all through colonial and provincial times, up to within a very recent period, such a procedure as this has been carried on under the superintendency of the supreme court of this state, and if a person, in the situation of this complainant, had, at any time in all these years, conceived himself to have been wronged in point of law, by the doings of such officers, he would have applied to that court, which, in its discretion, would have commanded such doings to be certified to it, so that what was right in law might be done. Such was the ancient and such has been the modern method of executing the law in such an affair, and there is, perhaps, no single attribute of the supreme court that is, and ever has been, more peculiarly its own than this great power of supervision and regulation, and, to a certainty, if it can be shorn of this prerogative, then none of its prerogatives are secure. From these considerations, I am led to the conviction that, if this act is to bear the interpretation which must be put upon it in order to uphold this suit, then it should, on constitutional grounds, be declared by this court to be utterly nugatory.

It will be observed that the bill in this case claims for itself no other footing besides this statute, and, in this respect, the idea of the pleader is, in my judgment, correct. For, whatever doubts may be entertained in some of the American states upon this subject, such doubts have not

prevailed either in England or in this state. It is believed that no instance can be adduced in which an English chancellor has undertaken to control the proceedings of a municipal body on the mere ground that such proceedings were irregular or illegal. If the acts of such bodies were not *extra vires*, it has always been conceded that they did not, except from the presence of special equities, fall under equitable control. Lord Cottenham, in *Frewin* v. *Lewis*, *4 Myl. & Cr. 249*, thus defines, in a few words, the doctrine of the English law. He says, speaking of the principles on which public officers and bodies will be controlled in his court: "So long as these functionaries strictly confine themselves within the exercise of those duties which are confided to them by law, this court will not interfere  *   * to see whether any regulation they make is good or bad; but if they are departing from their power which the law is vesting in them, if they are assuming to themselves a power over property which the law does not give them, this court no longer treats them as acting under the authority of their commission, but treats them, whether they be a corporation or individuals, merely as persons dealing with property without legal authority. While the court avoids interfering with what they do while keeping within the limits of their jurisdiction, it takes care to confine them within those limits; if they go beyond the line of their authority, and infringe or violate the rights of others, they become, like all other individuals, amenable to the jurisdiction of this court by injunction." And Judge Dillon, in referring to this and other authorities, remarks: "But if, in these cases, the property owners or the taxable inhabitants can have full and adequate remedy at law, equity will not interfere, but leave them to their legal remedy." *2 Dillon on Mun. Corp. 836.*

In this state, from time to time, a similar doctrine has been asserted and enforced. As illustrating, I shall refer to two cases, the first being that of *Morris Canal Co.* v. *Jersey City*, *1 Beas. 256*, in which Chancellor Williamson thus

Jersey City *v.* Lembeck.

clearly explains his views: "In the first place, it is insisted," he says, " that this court has not jurisdiction over the ordinances of a municipal corporation, and should not interfere with their execution; that the supreme court is the proper tribunal to review and correct the errors of inferior authorities. The authorities fully sustain the general principle that the court of chancery is not the proper tribunal to appeal to, to correct irregularities or· errors of inferior tribunals, and that in this case the court should not interfere with the ordinances of a municipal corporation." And, again, his words are: "As a general doctrine, this court does not claim the right to interfere for the purpose of preventing a corporation from enforcing its ordinances in regard to assessments. There would be no limit to litigation in this court, if this court were to claim jurisdiction over assessments in ordinary cases."

The second case above referred to is that of *Holmes* v. *Jersey City, 1 Beas. 310,* in which Chancellor Green, in delivering the opinion of the court, is equally clear and explicit in his declarations on this subject, and he says, alluding to the bill in that case: " I find in it no recognized ground for equitable relief. There is no averment of irreparable injury, and the case made by the bill shows that, in the nature of things, the injury cannot be irreparable. There is no charge of fraud, nothing, in short, but the fact that the city is not setting the curb-stones on the true line, by which the complainant will be put to expense, and his property, as he alleges, be of less value. And the point upon which the whole case turns, is· a mere question of law. I do not see why, on the broad frame of this bill, every act of a municipal corporation by which the property of a citizen is affected, whether it be the opening, paving or grading of streets, the regulation of buildings, the removal of nuisances, or the assessment of taxes, may not be the subject of injunction and the legal right be drawn in question in a court of equity."

And, in fact, upon the least consideration of the subject, it will be apparent that the rule thus forcibly enunciated by these experienced and eminent lawyers, is the only one that would be consistent with an equitable system, one of whose fundamental maxims is, that it will not take upon itself, except in certain well-known cases, to settle legal rights when the redress at law is sufficient for that purpose. And it has already been shown that such legal remedy, in a very complete form, exists with respect to this class of cases with which we are now dealing. The present complainant could have made his application for a writ of *certiorari*, unless such right had been forfeited by his own laches, and which, as a mode of redress, would have been even more efficacious than this bill, because, in such a proceeding, the assessment itself would have been annulled, whereas, in the present course of law, nothing but the lien upon the land is discharged. In the presence, therefore, of a convenient and complete legal remedy, there can be no pretence for an appeal to a court of conscience, upon general principles, in order to remove a cloud from the title of the complainant. As I have said, the statute in question is the sole foundation for this bill, and such statute is possessed of no efficacy for such a purpose.

Before leaving this branch of the subject, it is proper to say that this exclusion of equitable processes from matters of this nature, is not regarded by me as a defect in our legal system, for, if the power of chancery could be extended over this field, the effect would be most disastrous. Even it might not be too much to say, that, under such a control, no city in this state could, for any great length of time, properly administer its own affairs. Most of our assessments, relating to the taxing of lands and the making of streets and other public improvements, are, by our laws, declared to be liens upon land, so that, in this vast multitude of cases, every mistake in such procedures, affecting, as it must, many persons, would be affluent in litigation. Each person out of this multitude could maintain his bill and

could recover his costs from the public, and which costs, in many cases, would exceed the amount of the tax in dispute. Nor, by force of present laws, would it seem possible to restrain or repel this deluge of litigation, for if the right to file such a bill exists at all, such right is obviously an absolute one, in nowise resting in the discretion of the chancellor.

Chief Justice Caton, in his opinion in the case of *Chicago* v. *Frary, 22 Ill. 34,* has forcibly depicted the evils that would ensue from the interference of a court of equity with this class of cases. " Under such a system of the administration of the laws," such is his language, " with so complicated a revenue system as ours, rendered so by a tender regard for the rights and interests of the citizens, no government could exist for a single year. Let us now, by sustaining this bill, stretch out the strong arm of this court, and stay the hand of the collector in every case where any irregularity can be shown in the assessment of the revenue, and a flood of injunctions would spread over the land at once. State and county revenue would cease to be collected, at least till the termination of protracted litigation, and the wheels of government would stop." And, again, the chief justice says : " If we permit the injunction to be issued where the tax is authorized by law, and the thing taxed is liable to that tax, there is no stopping-point short of enjoining all taxes whenever any irregularity has intervened. This power the court of chancery has never assumed, nor could it, without the most disastrous consequences to the state."

Although I have come to the conclusion, from the foregoing considerations, that this statute cannot have the force ascribed to it, still, it seems to me, it is quite feasible to give it an effect that will not only be legal, but highly useful. The extent to which I would give it force may, in part, be best indicated by negations as to its operation in certain classes of cases. I would say it was not meant to be operative when the party in possession of lands has the

means, by an ordinary proceeding at law, of testing the adverse claim that he wishes to have settled, unless, in such a state of facts as was presented in the case of *Bogert* v. *City of Elizabeth, 12 C. E. Gr. 568,* in which the pretended lien was an absolute nullity, in consequence of the law itself under which it had been taken being unconstitutional, so that the proceeding, being *ultra vires,* it could be fairly said that the keeping on foot of such a mere pretence was, *per se,* unconscionable. And, even with respect to this case, it should be borne in mind that the assessment had fully run its course, and had exhausted itself in a sale of the lands, and that such sale was, and for all time must have continued to be, a mere nullity, to which even legislation could not impart life. The decision adjudged that such a state of things was a case within the statute; it went no further. But my exposition will exclude the class of cases embracing the one now under review, because the purpose of the act was to relieve, not persons who had the power to test the hostile claim by a direct proceeding in the usual mode, but to aid those persons whose situation afforded them no such opportunity. The inequity that was designed to .be remedied grew out of the situation of a person in the possession of land as owner, in which land another person claimed an interest which he would not enforce; and the hardship was that the person so in possession could not force his adversary to sue, and thus put the claim to the test. The title of the act indicates that this is its purpose, for it is an act " to *compel* the determination of claims to real estate." In the present instance, the complainant had it in his power, by one of the customary processes of the law, to bring to judgment the claim he wished to control, and it would, therefore, seem to be going out of the way to maintain that this statute is applicable in aid of his inaction. If a party in possession of land can throw the hostile claim into a course of law, and thus get rid of the cloud overhanging his estate, why should he not do it? and what reason is there to say that this act was designed to help a party who

was in no strait, but of his own choosing? On the other hand, there is a class of cases in its application to which the law under consideration would be highly reasonable and beneficial. I would instance, as a sample, the case of a doubtful claim upon land arising under a will, a person who asserts an absolute title being in possession. In this situation the existence of such a claim, no matter how inauthentic or unsubstantial, would work, oftentimes, a serious injury to such real owner, and, without statutory help, the latter might not, in all cases, be able to clear his title. In such a conjuncture the present act would operate favorably, and, in such connection, would be in harmony with legal and constitutional principles. In my view, that law was intended for the relief of such cases of hardship as this and other cases of a similar nature; but it was not intended to aid those who have no need of aid, and to this latter class the complainant belongs.

I think the decree should be reversed, and the bill ordered to be dismissed, with costs.

Decree unanimously reversed.