The following summary of the facts so far as necessary to be stated at present will show the contentions of the parties in a general way; This action was brought in the Superior Court of Cherokee County by the plaintiff against the defendant, both of which are North Carolina corporations, on 21 August, 1914. Plaintiff alleged that it was a corporation organized under the laws of North Carolina by virtue of a special act of the General Assembly ratified 16 February, 1909 (chapter 76, Private Laws of North Carolina 1909), and further alleged that by virtue of the rights conferred upon it by its charter it had during the year 1909 and thereafter, but before the organization of the defendant company, surveyed, staked out, located and adopted by authoritative corporate action, locations and sites on the Hiawassee River, in Cherokee Country, N.C. for building and maintaining two hydro-electric plants for the generation of electricity to be sold for heat, light and power purposes; that it had acquired title to 50 per cent of the lands necessary for its proposed developments, and had obtained contracts covering some lands for the same, and had begun condemnation proceedings for other lands; and that it had by deeds, contracts, and under condemnation proceedings 75 per cent of the lands necessary for its proposed developments; that on 21 June, 1911, it had duly filed in the office of the clerk of the Superior Court for Cherokee County maps and plats of its locations, as required by the terms of its charter, and that on or about 13 July, 1914, the defendant corporation had been organized and had purchased some lands lying above the proposed dams and hydro-electric developments of the plaintiff, which lands were necessary for the plaintiff's uses and purposes and were included in the maps *Page 712 
and plans of said developments as filed in the office of the clerk of the Superior Court of Cherokee County, and that the defendant (671) was proceeding to acquire by deed, contract and condemnation other lands and rights along and on Hiawassee River which was necessary for the plaintiff's proposed developments, and that the defendant was in this way and manner interfering with and obstructing and preventing the plaintiff from carrying out its plans to make the developments contemplated by its charter and by the surveys, maps, plan and proceedings used by it.
The defendant filed an answer and an amended answer in the case denying the allegations of the complaint of the plaintiff and pleading that if the plaintiff had ever acquired and adopted any locations on the Hiawassee River for its proposed developments it had prior to the beginning of this action abandoned the same; that the defendant had been organized as a corporation on 13 July, 1914, and had immediately after the organization of the defendant corporation adopted by appropriate corporate action certain locations for its dams and power houses on the Hiawassee River in Cherokee County, N.C. and that its right to any conflicting locations was superior to that of the plaintiff. Plaintiff replied to the defendant's amended answer and denied the allegation contained therein.
Upon the trial the following issues were submitted to the jury, who answered the same as follows:
1. Were the locations for the dams, reservoirs and public works claimed by the plaintiff surveyed and staked out on the Hiawassee River in the year 1909, as alleged in the complaint and as indicated on the maps offered in evidence by plaintiff, marked Exhibits 7 and 7-A? Answer: "Yes." (by consent).
2. If so, did the plaintiff in the year 1909 and thereafter, but before the organization of the defendant company in July, 1914, adopt said locations by authoritative corporate action, as alleged in the complaint? Answer: "Yes."
3. Did the plaintiff prior to the commencement of this action on 21 August, 1914, abandon its said locations and proposed plans, as alleged in the answer? Answer: "No."
4. Did the plaintiff file the maps or plats of its said locations in the office of the clerk of the Superior Court of Cherokee on or about 21 June, 1911, as alleged in the complaint? Answer: "Yes."
5. Did the plaintiff on or about 17 August, 1914, by authoritative corporate action, adopt the surveys and locations for its dams, reservoirs, and public works which had therefore been made and marked *Page 713 
out on the Hiawassee River, as alleged in the complaint? Answer: "Yes" (by consent).
6. Were the locations for the dams, reservoirs, and public works claimed by the defendant surveyed and staked out on the Hiawassee River, as alleged in the answer? Answer: "Yes" (by consent).
7. If so, did the defendant thereafter by authoritative (672) corporate action adopt said locations, and if so, when? Answer: "No."
There was a judgment in favor of the plaintiff, and the defendant appealed.
after stating the case: The plaintiff says that upon a fair analysis and consideration of the verdict there is little if anything left after the decision in the former appeal for the defendant's present contentions to rest upon, and for these reasons, as stated in its brief:
First it was found in the first issue, by consent, that plaintiff's locations for its dams, reservoir, and public works had been surveyed in the year 1909, as alleged in the complaint, and the plaintiff had alleged in its complaint that in the year 1909 that officers, engineers and representatives of the plaintiff had entered upon, explored and surveyed the lands bordering on the Hiawassee River for its location of said works. So the finding of the first issue by consent established the fact that the plaintiff had the proper surveys made.
Second. The jury found, based on abundance of testimony, as we insist, that the plaintiff has, set out in the second issue, prior to the organization of the defendant company, adopted said locations by authoritative corporate action.
Third. That the plaintiff did not abandon said locations, as alleged in the answer.
Fourth. That plaintiff had filed maps or plats of its location in the office of the clerk of the Superior Court of Cherokee County 21 Jun [June], 1911.
Fifth. That on 17 August, 1914, plaintiff had, by a formal resolution, adopted said locations for its dams, reservoirs and public works. This issue was found by consent of the defendant and was clearly proven by the minutes of the corporation introduced, dated 17 August, 1914.
Sixth. The jury found by consent that the locations claimed by the defendant had been surveyed and staked out on the Hiawassee River. *Page 714 
Seventh. That the defendant had not adopted such locations.
Plaintiff then insists that the defendant would not be entitled to a new trial in any event because of any error which arose either on the first, second, third, or fourth issues unless there was also reversible error arising on the seventh issue. And further, defendant would not be entitled to a new trial for reversible error arising on the seventh issue unless there was reversible error arising either on the (673) second, third, or fourth issues as well. In other words, the defendant agrees that the plaintiff had adopted locations on 17 August, 1914; now unless there was error on the seventh issue concerning the defendant's adoption of said locations prior thereto, then the verdict in favor of the plaintiff on the fifth issue establishing the plaintiff's location entitles the plaintiff to judgment, and, as before stated, reversible error, if it existed on the seventh issue, would not entitle defendant to a new trial unless there was also reversible error either on the second or third or fourth issues, and of course then only on the issue concerning which reversible error was found.
These are substantially the plaintiff's contentions upon the verdict, and they would seem to be a fair and reasonable construction of the same when we understand and consider the questions at issue.
When the case was here at a former term we remanded it so that the jury might find more definitely certain facts regarding the time when the plaintiff "surveyed, staked out, and adopted the locations of the sites of its dam, reservoirs and public works on the Hiawassee River," and also pass upon certain findings stated by the presiding judge as supplementary to the verdict of the jury, and especially to have it found under and issue submitted for the purpose whether plaintiff's map was duly filed in the office of the clerk of the Superior Court, and if it was, at what time. The jury have found all the essential facts in favor of the plaintiff, this being the second verdict.
It has been found that the map of the plaintiff's location was filed in the office of the clerk of the Superior Court, 21 June, 1911, as alleged in the complaint, and there was evidence, as we think, to support this finding. It has been held that "a paper-writing is deemed to be filed within the meaning of the law when it is delivered for that purpose to the proper officer and received by him, and it is not necessary to the filing of a paper that it shall be endorsed as having been so filed. The file mark of the officer is evidence of filing, but is not the essential element of the act" unless the statute makes it so. 34 Cyc., 587, sec. A-1; EurekaStone Co. v. Knight, 82 Ark. 164; Darnell v. Flynn, 69 W. Va. 146; Peoplev. Fisch, 164 Mich. 680; Edward v. Grand, 121 Cal. 254, 256; Tregambo v.Comanche Mill, 57 Cal. 501, 506; Hull v. Louth, *Page 715 109 Ind. 315; S. v. Foulkes, 94 Ind. 493; Masterson v. R. R., 82 N.E. 1021. Additional cases in other jurisdictions where this question has arisen will be found in Words and Phrases (2d Series), p. 531, and especially at p. 533, and the point is decided. the same way, in principle, by this Court in Glanton v. Jacobs, 117 N.C. 428;Smith v. Lumber Co., 144 N.C. 47, 49.
As far as the actual location is concerned, we have already held, when this case was here before, that prior right belong to that company which first defined and marked its route and adopted (674) the same for its permanent course or location by proper and authoritative corporate action. Street R. R. v. R. R., 142 N.C. 423; R.R. v. R. R., 57 W. Va. 641; In re Milwaukee Light, Heat and TractionCo., 112 N.Y. 663; R. R. v. R. R., 96 S.W. 199; Rochester v. R. R.,110 N.Y. 128; Elliot on Railroads, sec. 927; San FranciscoW. Co., v. Alameda Water Co., 36 Cal. 639; Water Co. v. Cowles,31 Cal. 215.
The two California cases refer to the efforts of rival companies to acquire water rights on the same stream, and in the last one of them it is said,: "Respondent therein having, prior to the institution of appellant's proceedings to condemn, secured essential property rights in the premises thereby sought to be condemned by successful negotiations and the construction of works necessary to the appropriation of the waters to accomplish all the business of its corporation, we can discover no just grounds for subordinating its rights thus acquired to the subsequent efforts of appellant to acquire the same property for similar purposes by compulsory process of acquisition."
In R. R. v. R. R., 27 Fed., 770, the Court said: "It is certainly equitable that a company which in good faith surveys and locates a line of railway and pays the expense thereof should have a prior claim for the right of way for at least reasonable length of time . . . . The right to use of the right of way is a public, not a private right. It is in fact a grant from the State, and although the payment of the damages to the owner is a necessary prerequisite to the State may define who shall have the prior right to pay the damages to the owner and thereby acquire a perfected right to the assessment. The owner cannot by conveying the right of way A. thereby prevent the State from granting the right to B., and, subject to the right of compensation to the owner, the State has the control over the right of way, and can by statute prescribed when and by what the right thereto shall vest, and also what shall constitute an abandonment of such right."
And in R. R. v. R. 96 S.W. Rep., 199, it was said by the Court: "When a company has actually located its right of way, and is in good faith following up its location by buying the land or instituting *Page 716 
proceedings to condemn it with reasonable diligence, another company cannot go to a point on the route which is neither the beginning nor the ending of its proposed line and run a race with the company which has begun at the beginning of its route and is going on in an orderly way to its other terminus. The railroad company is authorized to take the land under eminent domain, and when it has in good faith entered for this purpose, located its right of way and is proceeding to perfect its right, the law prefers him who thus first enters in good faith, and it cannot be permitted that another company with notice of its rights (675) shall make another survey right behind him and destroy his priority which he has thus gained. While it is true that on some days the Pine Mountain Company's were ahead of Cumberland Company's engineers, they got thus ahead by beginning in the middle of the line and then a running a race with the other people. The statute does not contemplate this. It contemplates a location in good faith and in the usual course of business. Under the circumstances, we conclude that the Cumberland Company has the better right. The motion to discharge the injunction granted in favor of the Pine Mountain Railroad Company is sustained, and that injunction is dissolved."
Discussing the same question in L. H. T. Co. v. R. R., 132 Wis. 313, the Court said: "In such case the prize would go the company which first secured a completed location. So it appears that prior to 16 January, 1906, the respondent company had made or adopted a fully completed survey over the disputed lands and determined in good faith to build its railroad thereon, had secured all the necessary franchises and crossing privileges from towns and villages, and had obtained option contracts on all but a very small fraction of said land, and intended in good faith to utilize such options and take deeds of the lands at an early date. These are very decisive acts, and unless it be necessary that it should have actually secured deeds or binding contracts to purchase the lands, these acts must be held to constitute a completed location, so far at least as to give precedence in a contest with a rival company seeking to obtain the same lands. Certainly it was not necessary that it should have paid for the lands or secured deeds. As to all the world except the owner, the appropriation of land for railroad purposes may be complete without either of these steps, and the only question then is whether it was necessary that it should have bound itself by contract to purchase the lands. We think not. The essential requirement is not that there should be a completed purchase, but that there should be a decisive corporate action taken in good faith locating the route and committing the corporation to that route, though not necessarily irrevocably. The securing of option contracts over *Page 717 
practically the whole line surveyed with the bona fide intention of utilizing them and completing the purchases and building the line must be held to be such a decisive act, and we therefore hold that the petition for condemnation was properly denied." R. R. v. R. R., 110 N.Y. 128. See, alsoR. R. v. R. R., 57 W. Va. 641, and note to Street R. R. v. R. R., 9 Anno. Cases, 689.
The plaintiff, therefore, has acquired the prior right.
The defendant has assailed the character of the plaintiff as being unconstitutional and invalid. We decided before that the charter was a valid exercise of the legislative power, and especially held (676) that the fact of allowing the plaintiff to engage enterprises and to exercise the power of eminent domain did not invalidate it, as it could purchase property, as it had done, for its private purposes, and condemn it when necessary for its public or quasi-public purposes, citing Cyc., 579; Land Co. v. Traction Co., 162 N.C. 314, and other cases. Besides, the plaintiff has not as yet attempted to condemn any property, and it is premature to raise a question which certainly is not presented now, and may never be. If hereafter plaintiff attempts to invade any of the property rights of the defendant, the latter will have ample time and opportunity to defend them in the proper forum.
We considered and decided in the former appeal other objections to plaintiff's charter and to its right to proceed in acquiring riparian and other property rights on the river by the means and measures set forth in the case. As far as appears, the defendant does not seem to have any right which is likely to be invaded, as the jury, by the seventh issue, have found that there was no adoption of the locations claimed by it, but we need not dwell on this matter any further, as we are of the opinion that, upon the verdict, the plaintiff is entitled to judgment regardless of this matter, as it is shown thereby that plaintiff acquired a prior and superior right, especially by that part of it contained in the first, second, third, fourth, and fifth issues, and those issues were answered by the jury upon sufficient evidence to support the findings.
The objection to the plaintiff's charter, that the thirty days notice required by Constitution, Art. II, sec. 12, had not been given, is untenable, as we have often held that the validity of a statute cannot be attacked in this colateral way. The same kind of objection was made inBroadnax v. Green, 64 N.C. 244, and Chief Justice Pearson said in regard to it (at p. 247): "We do not think it necessary to enter into the question whether this is a public-local act or a mere private act, in regard to which thirty days notice of the application must be given, for, taking it to be a mere private act, we are of opinion that the ratification certified by the Lieutenant-Governor and the Speaker of the House *Page 718 
of Representatives makes it a `matter of record' which cannot be impeached before the courts in a collateral way. My Lord Coke says `a record, until reversed, importeth verity.'" See, also, Gatlin v. Tarboro, 78 N.C. 119;Wilson v. Markley, 133 N.C. 616.
The position that the Legislature cannot grant the power of eminent domain to one public-service corporation unless it is granted to all such corporation, or in one or more counties unless granted in all, would greatly curtail the industrial growth and progress of the State if it is a correct one. For example, certain localities may be selected, as in this case, because, of the facilities afforded of conducting enterprises (677) calculated to promote the public welfare where the facilities and advantages necessary for the purpose exist. It could hardly be contended with any hope of success that in such a case the Legislature is without the power to grant the right of condemning property locally in order that a company may avail itself of those facilities which may exist in certain parts of the State and not in other sections. Such a right has been conferred in many instances, especially in the case of railroad companies and other like corporations which serve the public. It is not forbidden to be done by our Constitution, Art, I, sec. 7 (Bill of Rights), which declares that "no man or set of men are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services," because in this case the power to condemn is based upon the obligation to render that kind of service.
The Chief Justice said in the case of In re Spease Ferry, 138 N.C. 219, "that public ferries are not monopolies, but franchises granted in consideration of public services (Smith v. Harkins, 38 N.C. 619), and that there is a correlative duty devolved upon the grantees, as common carriers, to serve the public, and under public regulations of their charges and duties has been uniformly held from the earliest times and in all jurisdictions."
The distinction between this case and Bridge Co. v. Comrs., 81 N.C. 491, is stated by the Chief Justice. Electric light and power companies are public-service corporations, and their rates or charges to the public may be regulated as in the case of other public corporations.
It was said in Griffin v. Water Co., 122 N.C. at p. 207: "The defendant corporation operates under the franchise from the city, which permits it to lay its pipes in the public streets and otherwise to take benefit of the right of eminent domain. Besides, from the very nature of its functions it is `affected with a public use.' In Munn, v. Illinois, 94 U.S. 113, which was case in regard to regulating the charges of grain elevators, it was held that in England, from time immemorial, and in this country from its colonization, it has been customary to *Page 719 
regulate ferries, common carriers, hackmen, bakers, millers, public wharfingers, auctioneers, innkeepers, and many other matters of like nature, and where the owner of property devotes it to a use in which the public had an interest he in effect grants to the public an interest in such case, and must to the extent of that interest submit to be controlled by the public. Probably the most familiar instances with us are the public mills, whose tolls are fixed by statute, and railroad, telegraph and telephone companies, for the regulation of whose conduct and charges there is a State commission established by law. There have been reiterated decisions in the United States Supreme Court and in the several States affirming the doctrine laid down in Munn. v. Illinois, supra and as to every class of interest affected with a public use, among (678) others, water companies," citing Spring Valley v. Schottler,110 U.S. 347.
It is very generally held that a telegram company, acting under aquasi-public franchise, is properly classified among the public-service corporations, and as such is subject to public regulation and reasonable control. Telephone Co. v. Telephone Co., 159 N.C. 9.
The duties and obligations assumed by the plaintiff in its charter are, therefore, of such a nature that it may properly be characterized as a public-service corporation, rendering services to the community in like manner as in the cases above cited. It is declared to be a public-service corporation in Laws 1913, ch. 133. So that being a corporation which serves the public, it comes within the proviso or exception of Article I, section 7, of our Constitution.
In Mugler v. Kansas, 123 U.S. 623, the Court said in regard to the extent and operation of the Fourteenth Amendment upon local laws: "But this Court has declared upon full consideration in Barbier v. Connolly,113 U.S. 27, that the Fourteenth Amendment has no such effect. After observing, among other things, that the amendment forbade the arbitrary deprivation of life and liberty, and the arbitrary spoilation of property, and secured equal protection to all under like circumstances in respect as well to their personal and civil rights as to their acquisition and enjoyment of property, the Court said: `But neither the amendment — broad and comprehensive as it is — nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote health, peace, morals, education, and good order of the people and to legislate so as to increase the industries of the State, develop its resources and add to its wealth and prosperity," which was quoted with approval by this Court in S. v. Moore, 104 N.C. at p. 721, 722.
And Judge Cooley says in his work on Const. Limitations (7 Ed.), at p. 555: "The authority which legislates for the State at large must *Page 720 
determine whether particular rules shall extend to the whole State and all its citizens or, on the other hand, to a subdivision of the State or a single class of its citizens only. The circumstances of a particular locality or the prevailing public sentiment in that section of the State may require or make acceptable different police regulations from those demanded in another, or call for different taxation and a different application of the public moneys. The Legislature may therefore prescribe or authorize different laws of police, allow the right of eminent domain to be exercised in different cases and through different agencies, and prescribe peculiar restrictions upon taxation in each distinct municipality, provided the State Constitution does not forbid. These discriminations are made constantly, and the fact that the laws are (679) of local or special operation only is not supposed to render them obnoxious in principle."
And in the same work, at p. 554, Note 2, it is said: "To make a statute a public law of general obligation, it is not necessary that it should be equally applicable to all parts of the State. All that is required is that it shall apply equally to all persons within the territorial limits described in the act," citing S. v. County Commissioners of Baltimore29 Md. 516; Pollock v. McClurken, 42 Ill. 370; Haskel v. Burlington,30 Iowa 232; Unity v. Burrage, 103 U.S. 447.
This doctrine was approved by this Court in S. v. Moore, supra. The power to restrict legislation affecting public interests to certain localities was discussed and asserted in S. v. Barett, 138 N.C. 630, the Court remarking that it had been so long and in so many instances recognized that it was not deemed necessary to reexamine the grounds upon which it rests.
In our case there is nobody competent to raise the question, as the jury have found that defendant has no vested interest to be impaired, not having adopted any plan of improvement, and no condemnation of property having been attempted by the plaintiff, and no one in the excepted territory being a party to the suit. There is, therefore, no wrong done to the defendant and no violation of its constitutional rights. The legislation is neither partial nor discriminatory.
We do not see how the determination of this case can be affected by the argument in regard to riparian rights. If the plaintiff does not acquire by purchase the necessary land and water rights or easements it will have to condemn them and pay a just compensation for the same. It cannot interfere with the lawful rights of another, either above or below the place on the stream where it has obtained priority of location unless it has acquired by purchase or condemnation, or in some other legal way, the right to do so. It may be that hereafter the *Page 721 
extent of plaintiff's rights in the waters of the stream may arise in some way, but it is not presented at present. The plaintiff would, of course, have no power of eminent domain merely because it may be a riparian proprietor, as that power can be acquired only by legislative grant, it being a sovereign power. It is not an incident of private ownership. Lloydv. Venable, 168 N.C. 531; 1 Cyc. 567; Lewis on Em. Domain, sec. 240; Comrs.v. Bonner, 153 N.C. 66.
On the question of abandonment, we think that the learned judge presented the law to the jury in a very full, clear and ample manner and in strict accordance with the law upon that subject, as we understand it to be. Falls v. Carpenter, 21 N.C. 237; Faw v. Whittington,72 N.C. 321; Banks v. Banks, 77 N.C. 186; Miller v. Pierce,104 N.C. 391; R. R. v. McGuire, 171 N.C. 277; 1 Cyc. 3; Aiken v.Ins. Co., 173 N.C. 400; Public Utilities Co. v. Bessemer City, (680)173 N.C. 482. He did say that mere nonuser, or lapse of time, or delay in prosecuting the enterprise, or the existence of a period of time during which no work was done would not, under the circumstances, be sufficient of itself to constitute abandonment, but he as clearly stated to the jury, if not expressly then by the plainest implication, so that they could not have misunderstood him, that it was evidence of abandonment. If the defendant considered the charge in respect to this matter not as full as it ought to have been, it should have asked for it to be made more definite. McKinnon v. Morrison, 104 N.C. 354;Simmons v. Davenport, 140 N.C. 407; S. v. Yellowday, 152 N.C. 793;Orvis v. Holt, 173 N.C. 231. The charge not only stated the law in a general way, but explained it in much detail, and in all its bearings, and with strict regard to the evidence, which, it was claimed by defendant, tended to prove an abandonment by the plaintiff.
It is said in Elliott on Railroads, sec. 931: "No general rule of law applicable to all cases can be laid down as to what constitutes abandonment of the whole or a part of its right of way by a railroad company, but the question whether abandonment exists in a given case must be determined by the particular circumstances of that case," citing numerous cases in the notes. See, also R. R. v. Taylor, 57 Am. Eng. R. Cases; 1 Am. Eng. Enc., 296, 1; R. R. v. R. R., 159 Pa. 331.
We have assumed so far, and for the purpose of argument, that the defendant can set up the defense of abandonment, and that this right does not belong solely to the State. Having proceeded upon that assumption, it will not be necessary to consider whether it is a correct one. The question is discussed, however, in R. R. v. R. R., supra, and R. R. Co.'s Appeal,104 Pa. 399.
The court instructed the jury as to the effect of Laws of 1913, ch. 133, which fixes the time within which a water power company already *Page 722 
incorporated shall begin active work at two years after the passage of the act, and requires a diligent prosecution of the same, and provides further that if it is not so begun, the Corporation Commission may recommend to the Attorney-General that suit be brought for the State, through him, to declare a forfeiture of its charter. The court properly told the jury that the failure to comply with this law is something of which the State alone can take advantage, and it is so expressly provided in the act.
There are several questions of evidence, but it will not be necessary to consider them in detail. The deeds offered in evidence by the defendant were executed after this suit was commenced. We do not see the relevancy of them to this controversy in the light of the issues.
Ordinarily, unless properly introduced by supplemental answer (681) or other pleading, or by puis darrein continuance, defendant cannot avail himself of matters strictly of defense which have arisen since the action was commenced, or in an action involving the title property rely upon a title strictly of a defensive character which has been acquired since the commencement of the action, or matter which goes only to the further maintenance of the action. 31 Cyc. 684, 493, and 497. He will not generally be allowed to bolster up his case by such new matter as is here offered, on account of its dangerous tendency. There are cases where things happening post litem may be brought before the Court, but this is not one of them.
It was said in Hollingsworth v. Flint, 101 U.S. 591, 596: "The plaintiff could not avail himself in this action of a title acquired, or which did not subsist in him until after he commenced the suit. The title at the beginning of the action was the question to be tried."
And in Stein v. Bowman, 13 Peters, at p. 220. "The declarations offered as evidence were made subsequent to the commencement of this controversy, and in fact after the suit was commenced. It would be extremely dangerous to receive hearsay declarations in evidence respecting any matter after the controversy has commenced. This would enable the party by ingenious contrivances to manufacture evidence to sustain his cause."
The action should be tried as of the time when it was commenced, though there are a few exceptions to this rule which are not applicable here.
The other objections to evidence are of no substantial importance, as we discover nothing that shows any clear intention on the part of the plaintiff to abandon its location or any right it acquired by what it had already done in the furtherance of the project, nor anything to show that it was not acting in good faith with the intention of continuing in the prosecution of the work. Besides, the defendant had seriously *Page 723 
questioned the plaintiff's motives, and it was competent to rebut the accusation by evidence tending to show its falsity.
The defendant has assigned error in the charge of the court, but we have carefully examined the same, and it appears therefrom that the court has committed no such errors as alleged, but has given fair and correct instructions throughout, and the jury seem to have decided and answered the several issues submitted to them in accordance with the clear weight of the testimony. The refusal of a nonsuit was also proper, whether or not the plaintiff should have an injunction, as it is entitled to the other relief prayed for.
Defendant contends that an injunction cannot issue against it to stop interference with plaintiff's rights as determined by the jury, upon the ground that there has not been, and will not probably (682) be, any such interference as will entitle the plaintiff to such equitable relief, and also that plaintiff will have an adequate remedy at law. It is a mistake to suppose that plaintiff's only right in this case is that of a riparian owner acquired by purchase, as it has other rights conferred by its charter apart from its ownership of the banks of the stream or any part thereof. But defendant relies upon a case recently decided by the Supreme Court of the United States. Sears v. Akron, 38 Supreme Court Reporter (1 April 1918), page 245. An examination of that case will show that it has no application here. The Court did not decide in that case that an injunction would not lie generally to protect such rights as the plaintiff in this case possesses, but the restraining process was denied there for special reasons, among them the following: That plaintiff' charter, under the reserved power of the State as contained in the Ohio Constitution, was subject to amendment, and that the special act of the Legislature of Ohio, by which the city of Akron was authorized to divert and use the Tuscarawas and Little Cuyahoga rivers and tributaries thereto for the purposes of a water supply, must be regarded as an amendment of plaintiff's charter to that extent where there had been nothing done but the mere incorporation of the Cuyahoga Company, and no land had been acquired by it except a very small quantity, and there was no actual or probable interference with plaintiff's right in taking water from the streams for the use of the city. It is apparent from the statement of the facts in that case and the general trend of the opinion by Justice Brandeis that the Court was largely influenced in its refusal of equitable relief by injunction by the fact that, as said by the Court, "the property alleged to be now owned by the plaintiff was not acquired by it until after the city's development had been practically completed." The city, therefore, had acquired, for the present at least, the preferential right *Page 724 
to the appropriation of the rivers for its public supply of water by prior use, and this right was recognized as superior to that claimed by the plaintiff, and for the further reason that the plaintiff could not be harmed, so far as appeared at the time of the trial, by the city's taking water from the rivers for its uses. The Court said: "It follows from what has been said above, that at least until something more had occurred than incorporation, the city was free as against the Cuyahoga Company to appropriate any of the land or any of the water rights which might otherwise have come under the development described in its certificate of incorporation. Plaintiff contends, however, that it became vested with an indefeasible property right to proceed with its development (a) when by resolution the board of directors adopted the plan, or (b) when condemnation proceedings were begun. Whether the adoption of a plan by the company would (683) under the general laws of Ohio have vested in it such a preferential right as against rival power companies or other municipalities, we have no occasion to consider, for it is clear that Ohio retained the power as against one of its creatures to revoke any such right to appropriate property until it had been acted upon by acquiring the property authorized to be taken. R. R. v. New York,176 U.S. 335, and the act of 1911 and the ordinance (under which the city justified) were both passed before the company had acquired any property."
It will be observed that the Court did not decide as to the "preferential right" of the plaintiff under facts and circumstances such as exists in this case, while this Court has held, as shown by the cases above cited, that such a right exists in favor of this plaintiff upon the facts which were undisputed.
The case of Sears v. Akron originated in a Federal court, but the question involved is not one of Federal law, and even if there were any conflict between that case and what we decide, and there is none), we would be governed by our own view of the law as applicable to the special facts of this case. It may be further said that our case differs from Sears v.Akron in the fact that the defendant's contemplated acts will be most harmful to the plaintiff and will seriously impair its rights and utterly destroy them if defendant's proposed plan of development is fully carried out. Besides, we have a statute in this State which permits the plaintiff to establish its rights and remove any cloud from them by suit against a party claiming adversely thereto, and an injunction, under our law, is a remedy which can be resorted to for the purpose of protecting the same against threatened invasion by the defendant, or to prevent it from setting up any further and false claim to the rights and property in controversy and thereby *Page 725 
clouding the plaintiff's title and impairing the value of its property rights. Revisal, sec. 1589. The amended statute and annotations will be found in 1 Pell's Revisal of 1908, at p. 1588, sec. 1589. This statute being of a remedial and beneficial nature should be liberally construed, and should be held to embrace all cases coming fairly and equitably within its scope. We said of this statute in Chrisman v. Hilliard, 167 N.C. 4, at p. 8:
"The statute has been said to be an extension of the remedy in equity theretofore existing for the removal of clouds on title, and is intended to afford an easy and expeditious mode of determining all conflicting claims to land, whether derived from a common source or from different and independent sources. It is fairly remedial and beneficial in its nature, and should therefore be construed liberally. It is also a statute of repose, and also for that reason is entitled to favorable consideration. Adler v. Sullivan, 115 Ala. 582; Walton v. Perkins,33 Minn. 357; Holmes v. Chester, 26 N.J. Eq. 81. It deprives the defendant of no right, but affords him every opportunity of defending (684) the validity of his title; but in the interest of peace and the settlement of controversies, it allows his adversary to put to the test of early judicial investigation, and does not compel plaintiff to wait on his pleasure as to the time when the inquiry shall be made, and thus give defendant an unfair advantage over him. Jersey City v. Lembeck,31 N.J. Eq. 255. The plaintiff is not required to have possession as a condition precedent to his right of action, nor will the apparent invalidity of defendant's title deprive him of the statutory remedy.Daniels v. Fowler, 120 N.C. 14; Rumbo v. Mfg. Co., 129 N.C. 9; Beckv. Meroney, 135 N.C. 532; Campbell v. Cronly, supra. The beneficial purpose of the statute is to free the land of the cloud resting upon it and make its title clear and indisputable, so that it may enter the channels of commerce and trade unfettered and without the handicap of suspicion, instead of remaining idle and unremunerative. This case is within its letter and spirit, and plaintiff has a right to the relief he seeks if he can make good his allegations," citing Campbell v. Cronly,150 N.C. 457.
And in a more recent case this Court gave it a broad interpretation in order to carry out the evident purpose of its enactment, and said: "Having reference to the broad and inclusive language of the statute, the mischief complained of and the purpose sought to be accomplished, we are of opinion that the law, as it terms clearly import, was designed and intended to afford a remedy wherever one owns or has an estate or interest in real property, whether he is in or out of possession, and another wrongfully sets up a claim to an estate or interest therein which purports to affect adversely the estate or interest of the true *Page 726 
owner and which is reasonably calculated to burden and embarrass such owner in the full and proper enjoyment of his proprietary rights, including the right to dispose of the same at its fair market value. And it should and does extend to such adverse and wrongful claims, whether in writing or parol, whenever a claim by parol, if established, could create an interest or estate in the property, as in case of a parol trust or a lease not required to be in writing. And it should be allowed, too, when existent records or written instruments reasonably present such a claim, the statute preventing all hardship in such cases by its provision that if the holder does not insist on the same in his answer or does not answer at all, the plaintiff shall pay the costs." Satterwhite v. Gallegher, 173 N.C. 525, at p. 528, citing Rumbo v. Mfg. Co., 129 N.C. 9.
Referring to a similar statute of Nebraska, Justice Field said, inHolland v. Chellen, 110 U.S. 15 (cited in Chrisman v. Hilliard, supra): "Any person claiming title to real estate, whether in or out of possession, may maintain the suit against one who claims an adverse (685) estate in it for the purpose of determining such estate and quieting his title. It is certainly for the interest of the State that this jurisdiction of the court should be maintained, and that causes of apprehended litigation respecting real property necessarily affecting its use and enjoyment should be removed, for so long as they remain they will prevent improvement and consequent benefit to the public. It is a matter of everyday observation that many lots of land in our cities remain unimproved because of conflicting claims to them. It is manifestly to the interest of the community that conflicting claims to property thus situated should be settled so that it may be subject to use and improvement. To meet cases of this character, statutes like the one in Nebraska have been passed by several States, and they accomplish a most useful purpose."
Referring to the remedy of injunction as auxiliary to the principal relief of removing a cloud or preventing one from being thrown on the title, the general rule is thus stated 1 High on Injunctions (4 Ed.), p. 349, sec. 372: "The prevention of a cloud upon title is a salutary branch of the jurisdiction of equity recognized by all the authorities and founded upon the clearest principles of right and justice. The jurisdiction by injunction to prevent a cloud upon title is closely analagous to the well-settled jurisdiction of courts of chancery for the removal of cloud upon title; and the reasoning which supports the jurisdiction in the latter case would seem to apply with equal if not greater force in the former. It seems, therefore, to follow as a necessary consequence that if the aid of equity may be invoked to remove a cloud upon title to realty, it may with equal propriety be exerted to enjoin such illegal acts as will necessarily result in a clouded title." *Page 727 
As to the jurisdiction of equity to grant a perpetual injunction for the purpose of quieting a title or right in property which has been fully established when necessary to fully protect the complainant or make his remedy effectual, see Wickliffe v. Owings, 17 How. 47. And with respect to the remedy which is given by statute in several of the States, including this one, it was said by the Court in Spencer v. Merwin, 80 Conn. 330, at p. 334:
"General Statutes, sec. 4053, authorizes this special statutory remedy when legal injury results to the owner in possession of land from unlawful claim of an adverse estate or interest in that land; the statutory relief authorized is equitable, and consists in a judgment quieting and settling the title to the land in dispute, and necessarily includes such incidential relief as may be proper to make the main equitable relief granted full and complete."
It was held in Oakley v. Williamsburg, 6 Paige 2621, and virtually also in Petit v. Shepherd, 5 Paige 493, that a court of equity has jurisdiction to enjoin a defendant from proceeding in an illegal act which will operate so as to cast a cloud on the plaintiff's interest (686) or right in real estate, and thereby diminish its value. And inMeyer v. Phillips, 97 N.Y. 485, it was decided that one through whose lands various persons are threatening to float a large number of logs, using a stream thereon for the purpose, and claiming a right in the public to so use the stream, may maintain an equitable action to quiet his title and settle his rights and prevent the threatened cloud.
Of course, the danger to plaintiff must not be merely speculative or imaginary, for an equitable action will not lie to remove a cloud on title or to prevent one unless it is made to appear that there is substantial ground of apprehension that defendant will so act as to cloud the same, and that there is a detemination [determination] or purpose to do so, and it was so held in Sanders v. Davenport, 95 N.Y. 477, affirming same case reported in 30 Hun. 161.
An action will lie, not only to remove an existing cloud on title, but also to prevent one from being created (Thomas v. Simmons, 103 Ind. 538), and where the object is merely preventive an injunction is the proper remedy to restrain the doing of the wrongful act.
In our case, the title of plaintiff, whether it is considered as growing out of the ownership of land or water rights, or an easement or incorporeal hereditament therein, has been established by a verdict and a judgment upon it, and, therefore, the right is clear, and the injunction extends so far only as to prevent the defendant from doing the threatened acts which, if done, will certainly interfere with and obstruct plaintiff in prosecuting its plan of development, to which it *Page 728 
has established, under law, a preferential right. If not restrained by the injunctive process of the court, defendant may very seriously harass and hamper the plaintiff, who is now engaged in a work of improvement which will be of great value and usefulness to the community where it is situated.
The recent amendments of our Constitution have nothing to do with this case, for as to it they operate and take effect prospectively.
We have carefully examined the case as it appears in the record and have been unable to find any error in the proceedings or judgment.
No error.
Cited: Futch v. R. R., 178 N.C. 284; Kornegay v. Goldsboro,180 N.C. 451; Blacknall v. Hancock, 182 N.C. 372; Retreat Association v.Development Co., 183 N.C. 44; Eagles v. R. R., 184 N.C. 69; S.c.,186 N.C. 180; S.c., 188 N.C. 129, 131; Hardware Co. v. Cotton Co.,188 N.C. 445; Gallimore v. Thomasville, 191 N.C. 6; S. v. Dixon,215 N.C. 177; Ramsey v. Ramsey, 224 N.C. 113; Bailey v. Davis, 231 N.C. 89;S. v. Felton, 239 N.C. 585; Vandiford v. Vandiford, 241 N.C. 45; FurnitureCo. v. Baron, 243 N.C. 506.
(687)