## CONSOLIDATED INDIANA COAL CO. v. NATIONAL BITUMINOUS COAL COMMISSION.

### No. 6734.

Circuit Court of Appeals, Seventh Circuit.
March 13, 1939.

A. B. Enoch and W. F. Peter, both of Chicago, Ill. (W. F. Dickinson, of Chicago, Ill., of counsel), for petitioner.

Thurman Arnold, Asst. Atty. Gen., and Robert L. Stern and Robert E. Sher, Sp. Assts. to Atty. Gen., Robert W. Knox, Gen. Counsel, of Washington, D. C., Jerome Mayer, of New York City, Atty., National Bituminous Coal Commission, for respondent.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition to review an order of the National Bituminous Coal Commission, entered June 6, 1938, which (1) denied the petitioner's application for exemption from the Bituminous Coal Act of 1937, 15 U.S.C.A. §§ 828–851, insofar as said application was based on Section 4, Part 2 (*l*) of the Act, 15 U.S.C.A. § 833(*l*) and (2) dismissed as premature, without prejudice the application for exemption of petitioner's intrastate transactions from the Act. The effect of the order thus was to hold only petitioner's interstate transactions subject to the Act.

In view of the rather limited question presented, there seems to be no occasion to go into detail with reference to the provisions of the Act, the general purpose of which was to stabilize the bituminous coal industry. Briefly it provides for the establishment of a Code in which producers of bituminous coal may become members. A penalty tax of 19½% on the price or market value at the mine is imposed on all bituminous coal sold or distributed in the domestic markets in the United States, but such tax is waived or remitted with respect to producers who accept membership therein. The expense of administering the Code is imposed upon the members in the form of assessments computed on a tonnage basis. Petitioner, while a member of the Code, has refused to pay such assessments, claiming exemption from Code requirements in this, as well as in other respects. Its application for exemption is based upon Section 4—II (*l*), which provides: "The provisions of [section 831, 832 and] this section shall not apply to coal consumed by the producer or to coal transported by the producer to himself for consumption by him."

A hearing upon petitioner's application was had before an examiner of the Commission, and certain facts established which are not in dispute. Petitioner, a corporation organized in 1905, pursuant to the laws of the State of Maine, was permitted by its charter to conduct a general mining and selling business in connection with coal. All of its stock, with the exception of qualifying shares, was issued to the Chicago, Rock Island and Pacific Railway Company (hereinafter called Rail-

way Company), incorporated under the laws of Illinois and Iowa, on whose behalf petitioner held title to bituminous coal properties and leases. This was done so that the Railway Company might have a cheaper and more dependable supply of fuel for its operations.

The Railway Company, December 1, 1933, instituted in the United States District Court of this jurisdiction, proceedings for reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, wherein trustees were appointed. At the time of such appointment, title to the capital stock of the petitioner, as well as all other property of the Railway Company, passed to and became vested in the trustees, where it yet remains.

Petitioner originally owned properties in Iowa, Illinois and Indiana. For the past 18 years the only mining properties from which coal has been extracted by it have been in Iowa. Since 1935, the only mine from which coal has been taken by petitioner is known as Mine No. 3, near Williamson, Iowa. In 1905, the Railway Company advanced to petitioner $273,000 cash for the purchase of coal lands in the State of Iowa. The Illinois properties of petitioner were disposed of in 1917 and its Indiana properties in 1920. These properties were sold for cash, which was turned over to the Railway Company.

In 1933, petitioner sold Mine No. 3 to the Rock Island Improvement Company, a subsidiary of the Railway Company, in return for bonds which were turned over to the latter. The Rock Island Improvement Company, the stock of which was also owned by the Railway Company, immediately leased the property back to petitioner, and petitioner now operates the property just as it did before, paying the Improvement Company the sum of 3¢ per ton for all coal produced for rental and depletion. For many years past the entire output of coal mined by petitioner has been used by the Railway Company and trustees as railroad fuel, with certain exceptions not here material. All funds to enable the petitioner to function have been supplied, from time to time, by the Railway Company and the trustees—no funds having been obtained from any other source. Petitioner has had no debts, since all charges against it have been assumed by the Railway Company and the trustees—has never declared any dividends, and under the working arrangement which it has with the Railway Company and trustees, has never had and could not have any profits.

With the exception of a Superintendent at the mine, the officers of petitioner are appointed by the trustees from their official staff engaged in the operation of the railroad, and they receive no pay from petitioner. The President of petitioner is the Secretary and Treasurer for the trustees; the General Auditor of petitioner is the General Auditor for the trustees; the Vice President of petitioner is assistant to the trustees; the Secretary and Treasurer of petitioner is Assistant Secretary and Assistant Treasurer for the trustees, and the Assistant Treasurer of petitioner is Cashier for the trustees. All of petitioner's officers are full time employees of the trustees.

The Superintendent of petitioner at the mine reports directly to, and performs all his duties at the mine under the supervision and direction of the chief operating officer of the trustees who is not an officer of petitioner. The person who purchases all of the materials and supplies for petitioner is the Purchasing Agent for the trustees. Petitioner's books and records are kept by the General Auditor for the trustees in his office at Chicago, and the legal department for the trustees looks after all of the legal work of petitioner, without compensation from it. Each Friday the trustees notify petitioner's Superintendent how much coal will be desired the following week. The trustees take all the coal produced by petitioner at the time (with certain exceptions not here material) which is consigned to various points on the railway system, carried by it without charge, and used exclusively in the operation of the railway system.

Petitioner sends invoices to the trustees on the first and fifteenth of each month showing the tonnage of coal delivered and the cost of production thereof. This covers all items which enter into such cost, including wages and salaries of men employed, compensation and other insurance and the royalty paid by petitioner on account of its lease with the Rock Island Improvement Company. The trustees issue vouchers in such amount to the petitioner without any allowance for profit, which are deposited in a bank account in petitioner's name, from which it, by check, pays for labor, material, supplies and other items of expense incurred in the production of coal. Petitioner's Superintendent contracts for

the hiring of men and the purchase of supplies, which authority, as well as all other exercised by him, is subject to supervision by the chief operating officials of the Railway trustees.

The examiner concluded that petitioner and the Railway Company were separate and distinct corporate entities and that petitioner was not a consumer of the coal it produced within the meaning of Section 4—II (*l*). He also found that the Railway Company was the consumer of coal produced and that such coal was transported by it in interstate and intrastate commerce after sale and transfer of title at the mine, and that, therefore, the coal produced by the petitioner was not exempt, and recommended that the Commission enter an order denying petitioner's application for exemption. Exceptions were filed to the Examiner's report by the petitioner, based largely, if not entirely, upon the conclusions reached by the Examiner. Such exceptions were overruled by the Commission—its essential conclusion being to the effect that to allow petitioner's application for exemption would ignore its corporate entity; that the coal produced and delivered to the Railway Company necessarily constitutes commerce in bituminous coal intended to be regulated by Congress.

Respondent suggests that the questions presented for review are:

"1. Whether a mining corporation which is a wholly owned and controlled subsidiary of the corporation which consumes the coal produced comes within the purview of Section 4-II (*l*) of the Bituminous Coal Act, which section exempts from the Act 'coal consumed by the producer or * * * transported by the producer to himself for consumption by him.'

"2. Whether the Commission's finding that petitioner does not fall within the purview of Section 4-II (*l*) is supported by substantial evidence.

"3. Whether interstate transactions between petitioner and the consuming railway corporation constitute interstate commerce subject to the Act and the federal commerce power."

Petitioner suggests that the first question presented by respondent is stated too broadly, in that a wholly owned and controlled subsidiary might or might not be entitled to exemption, depending on the facts of the case, and insists that instead, the real question is:

"Whether a wholly owned and controlled subsidiary that does not function as an ordinary corporation, but exclusively as a mere department of the owning corporation in assisting the latter to produce transportation service, is entitled to ask that the coal mined in its name at the direction and under the continuing supervision and control of the owning corporation be granted exemption under Section 4 (*l*) of the Act."

Under the issue presented by respondent, the controversy is to be determined solely upon the premise that petitioner is a subsidiary corporation with a separate and distinct entity, from which it necessarily follows that it was the producer of the coal with the Railway Company as the consumer, and, therefore, the exemption provision is inapplicable. It is pointed out in this connection that the application for exemption was filed by petitioner rather than the Railway Company and argued from this that if any principle of agency applies, the petitioner, as the alleged agent, is claiming that when its principal consumes coal, it consumes coal.

On the other hand, the question, as presented by petitioner, is broader in its aspect and predicated upon the theory that it is a wholly owned and controlled subsidiary of the Railway Company trustees, which does not function as an ordinary corporation, but is acting rather in the capacity of an agent for the Railway Company and that, inasmuch as the coal produced by it is done so under the direct management, supervision and control of the Railway Company, the latter is both the producer and the consumer of the coal. Petitioner argues, therefore, that the coal is both produced and consumed by the trustees, as those words are used in the Act.

Because of the fact that the application for relief was presented by the petitioner rather than the railway company, we find ourselves in a somewhat confusing situation. It is claimed by the petitioner that in presenting the application in its name, it was merely acting on behalf of the trustees of the Railway Company, as their agent, and under their directions, and that, under such circumstances, it is merely a nominal party to the proceedings brought in behalf of the trustees who have the beneficial interest. While the petition does not expressly aver that it is filed on behalf of the trustees,

yet from its allegations such fact may be readily concluded. The petition proceeds solely upon the theory that the coal extracted from the mine was both produced and consumed by the trustees in the operation of the railroad system, and that petitioner was acting merely in the capacity of trustees' agent in such production. The relief sought in the petition was, in unmistakable terms, for the benefit of the trustees. No question was raised before the Commission as to whether or not the proceeding was instituted in the name of a proper party. If petitioner's theory is maintainable, we see no reason why the petition might not properly be filed in its name, and under the circumstances, we shall treat it as having been filed for and on behalf of the trustees.

■ Respondent evidently predicated its conclusion upon the theory that petitioner on the one hand, and the trustees on the other, constituted separate corporate entities and ignored the contention advanced by the petitioner that it was merely serving the trustees in the capacity of agent and that, as such, it was only an instrumentality of the trustees. In this, we think, respondent is in error. The conclusion is inescapable that petitioner was the agent of the trustees in the production of coal, and this is true irrespective of whether petitioner and the Railway Company be considered as separate and distinct corporations, or whether, under the circumstances, they be considered as merged. Authorities cited and relied upon by respondent, we think, are either distinguishable or not in point. New Colonial Ice Company v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348, is typical of the numerous cases relied upon, clearly distinguishable from the instant situation. In that case, in considering whether two corporations must be considered as separate entities for revenue purposes, the court on page 441, 54 S.Ct. on page 791, said:

"Thereafter neither corporation had any control over the other; the old corporation had no interest in the assets or business, and the chance of gain and the risk of loss were wholly with the new one. Thus the contention that the two corporations were practically the same entity and therefore the same taxpayer has no basis, unless, as the petitioner insists, the fact that the stock holders of the two corporations were substantially the same constitutes such a basis."

Thus, the language just quoted clearly distinguishes that case from the present one. Here we have the trustees in bankruptcy of an insolvent corporation owning all of petitioner's stock, furnishing all the money by which the coal is produced, having complete control, supervision and dominion over the petitioner both as to the amount of coal produced and the time of its production. Petitioner makes no profit and under its mode of operation, a profit would be impossible, as nothing more can be charged than the cost of production. Petitioner does not have title to the coal rights, or so far as we are able to discern, title to any property, personal or real, used in the production of the coal; it does not own a car, rail, prop, tie or a mule. Much stress is laid upon certain findings of fact made by the Commission. For instance, it was found: "Applicant has a separate bank account; pays its current indebtedness, its miners and Superintendent; and makes its own contract for the hiring of men and purchase of supplies." Assuming there is substantial evidence to sustain such a finding, yet in the same connection, the record discloses undisputably that the "separate bank account" was merely a matter of bookkeeping convenience, that all of the money in this account was furnished by the trustees and at no time did petitioner have any money which belonged to it. When "its miners" were paid from this account, they, of course, were paid money furnished by the trustees. When it is found that the petitioner "makes his own contract for the hiring of men and purchase of supplies," it must likewise be stated that these acts, as well as all other acts performed by the petitioner, are done under the direct control, supervision and direction of the trustees.

■ We are not unmindful of the effect to be given by us to the "finding of the Commission as to the facts if supported by substantial evidence." We do not understand, however, that we are bound to accept the conclusions based upon such facts, but whether so or not, we have no hesitation in holding that the facts, as found, clearly establish that petitioner was acting solely in the capacity as agent for the trustees. To hold otherwise is to ignore the plain facts of the situation.

The case of New Colonial Ice Company v. Helvering, supra, is distinguished by the court itself from that of Southern Pacific

Co. v. Lowe, 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142. There, the court in discussing a similar situation, said (page 337, 38 S.Ct. page 543): "While the two companies were separate legal entities, yet in fact, and for all practical purposes they were merged, the former being but a part of the latter, acting merely as its agent and subject in all things to its proper direction and control."

This statement adequately describes the instant situation. The court, on the same page, made a further statement which seems to be pertinent to the instant situation: "The fact that the books were kept in accordance with the provisions of the lease, so that these funds appeared upon the accounts as an indebtedness of the lessee to the lessor, cannot be controlling, in view of the practical identity between lessor and lessee."

In Chicago, Milwaukee & St. Paul Railway Company et al., v. Minneapolis Civic & Commerce Association, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229, the court very clearly distinguishes those situations wherein an identity of corporate interests has been denied and those wherein it has been recognized in the form of agency. As to the former class, the court on page 500, 38 S.Ct. on page 557, said: "Much emphasis is laid upon statements made in various decisions of this court that ownership, alone, of capital stock in one corporation by another, does not create an identity of corporate interest between the two companies, or render the stockholding company the owner of the property of the other, or create the relation of principal and agent or representative between the two. [Citing cases.]"

As to the latter class, it said on the following page: "While the statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies. [Citing cases.]"

Another case relied upon by respondent is that of In re Fox West Coast Theatres, 9 Cir., 88 F.2d 212. Therein, it is said, page 228: "The rule that corporate entity must be recognized in spite of stock ownership has recently been stated by a number of Circuit Courts of Appeals."

The court then cites and discusses numerous authorities in support of such statement. It will be noted, however, that in none of these cases was the court considering a situation, such as is here presented, wherein the alleged corporate entity was a mere shell with no authority on its own account to act or perform.

In State v. St. Paul Union Depot Company, 42 Minn. 142, 43 N.W. 840, 6 L.R.A. 234, wherein it was claimed the defendant was an independent corporate entity, the court, in discussing such question, on page 842, said: "The state plants itself on the technical ground that defendant is a separate and independent legal entity, and that we have no right to consider the functions which it performs, or the relations which it bears to the railway companies who own its stock and use its depot. We think this is too narrow and technical a view of the case. When evasions have been resorted to by railway companies or others to escape taxation, we have unhesitatingly looked through the external form or dress to the substance of the transaction, and the same rule should be applied against the state."

There are numerous cases [1] wherein the courts have recognized that a corporation, in its relation with another, may be merely that of agent, and we see no reason why it should be otherwise. In the instant situation, the trustees of the Railway Company could produce coal only by agents, and we discern nothing to preclude a corporation from being the agency thus utilized. We, therefore, are of the opinion that the coal involved in this proceeding was produced by the trustees by and through the agency of petitioner, and that it is consumed by the trustees in the operation of its railroad. Being both the producer and the consumer of the coal, it is entitled to the exemption provided in Section 4-II (*l*) of the Act.

Respondent argues, not without logic, that this construction of the Act is con-

[1] United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; United States v. Lehigh Valley R. Co., 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458; Wabash Railway Co. v. American Refrigerator Transit Co., 8 Cir., 7 F.2d 335; Industrial Research Corp. v. General Motors Corp., D.C., 29 F.2d 623.

trary to the intent of Congress as disclosed by its legislative history. We are reminded that the Bill was amended in the Senate so as to define "producer" to include "a wholly owned subsidiary or other legal entity having identical ownership." The Senate amendment was eliminated in conference and omitted from the Bill as enacted. It is urged that because the language "a wholly owned subsidiary or other legal entity having identical ownership" was rejected by Congress, that it was plainly the intention not to permit the exemption of coal produced by such a corporation. We do not think this result necessarily follows. To so conclude is to impute to Congress an intention to abrogate the well recognized law of principal and agent. It, no doubt, was the intention to include coal produced by a corporation occupying a status merely as a subsidiary or affiliate, but that purpose can have no application where the petitioner, as here, whether termed a subsidiary corporation or what-not, is producing the coal solely in its capacity as agent.

That Congress intended to exclude from the requirements of Section 4, coal consumed by the producer, is obvious, and we think it must be held that such exclusion is permissible whether the consumer produced the coal in its individual capacity or through the capacity of an agent. To hold otherwise is to countenance a situation in the instant matter which borders close to absurdity. In 1936, the cost per ton of producing the coal was $2.14. The Code price in effect at that time and place was $2.70 per ton, or 56¢ per ton in excess of the production cost. Inasmuch as petitioner receives from the trustees only the actual cost of production, it would be required, we assume, to include such excess in the cost of production, receive it from the trustees and then return it to the trustees. On the basis of the annual output from Mine No. 3, this excess price would represent annually the sum of $196,000; that amount to be received by the petitioner, from the trustees, as an item of the cost of production and then returned to the trustees as a profit from such production. We do not believe that Congress intended to create such a situation. To so hold could contribute nothing toward stabilization of the coal industry and could afford no assistance to the producer, the consumer, or the public.

In view of our conclusion that the trustees of the Railway Company were the producers and consumers of the coal, and, therefore, entitled to be exempted as provided by Section 4-II (*l*) of the Act, there is no occasion for us to discuss or decide the character of commerce involved in the transportation of the coal under the existing circumstances.

It is, therefore, our opinion that the order of the Commission denying petitioner's application to be exempted as provided by Section 4-II (*l*) of the Act was erroneous and that such application should have been allowed. It is, therefore, the judgment and decree of this court that the application for such exemption, in the manner and to the extent requested, should be and is herewith allowed.