UNITED STATES ex rel. and for Use of. TENNESSEE VALLEY AUTHORITY v. POWELSON et al.

No. 4679.

Circuit Court of Appeals, Fourth Circuit. March 10, 1941.

William C. Fitts, Jr., of Knoxville, Tenn., Gen. Counsel, Tennessee Valley Authority (Joseph C. Swidler, S. Frank Fowler, and Charles J. McCarthy, all of Knoxville, Tenn., Attys., Tennessee Valley Authority; L. B. Bolt, Philander P. Claxton, and Robert H. Marquis, all of Washington, D. C., on the brief), for appellant and cross-appellee.

Isidor J. Kresel, of New York City (G. L. Jones, of Asheville, N. C., on the brief), for appellee and cross-appellant.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal and a cross-appeal from a judgment awarding damages in a condemnation suit instituted, under Sec. 25 of the Tennessee Valley Authority Act of May 18, 1933, 48 Stat. 58, 70, 16 U.S.C.A. § 831x, by petition of the United States on the relation of the Tennessee Valley Authority. The purpose of the suit was to condemn lands required for the construction of the Hiawassee Dam and Reservoir on the Hiawassee River in Western North Carolina and a number of landowners affected by the dam and reservoir were made parties. Among these was the Southern States Power Company, which has since assigned to W. V. N. Powelson, its sole stockholder, all of its interest in the lands affected and any awards of damages that have been made or may be made with respect thereto.

The case was duly referred to three commissioners, as provided by the act, for the assessment of compensation for the property sought to be condemned; and the award of these commissioners was accepted as to all property involved, except that of the power company. As to that, the commissioners fixed the value of the land taken at $1,437,000, with severance damages of $253,000 to the remainder and $110,000 as damages for the taking of the small Murphy hydro-electric plant, or a total award of $1,800,000. The parties agreed on the award of $110,000 for the Murphy plant but excepted to the other findings of the commissioners, and the case was heard before a specially constituted court of three District Judges, as provided by the act. The court reduced the valuation of the land taken to $976,289.40 and the severance damages to the remaining lands to $111,791.23. It approved the valuation of $110,000 for the Murphy plant upon which the parties had agreed, but awarded $100,000 as severance damages to the connected property resulting from the taking of that plant. The total amount awarded by the judgment of the court below, therefore, was $1,298,080.63, of which the item of $110,000 is not disputed. From the judgment both parties have appealed.

Question is raised at the outset as to the character of review provided by the statute. It is said that, because of the provision that we shall dispose of the case upon the record "without regard to the awards or findings theretofore made by the commissioners or the district judges", the case is to be heard by us de novo and not as an appeal. We do not so interpret the statute. We are not authorized to take testimony, as are the judges of the District Court, but are to hear the case just as we hear other appeals upon the record made in the District Court. The judges and commissioners who took the testimony had the advantage of seeing and hearing the witnesses; and their findings, under well-settled rules, are entitled to special weight on that account. The commissioners visited the premises and they, as well as the judges, gave literally weeks and months to hearing a case which was heard before us in a single day. The trial court was thus in a better position than an appellate court could possibly be to determine questions of fact; and it is hardly reasonable to suppose that

it was the intention of Congress that we should pay no attention whatever to the findings of that court. The reasonable construction of the statute, we think, is merely that we are not to be bound by the findings of the trial court, but are to consider them in the light of the record, just as we consider similar findings in other appeals in which we have power to review the facts.. The commissioners appointed by the court below were men of high character and sound judgment, the chairman being an outstanding lawyer now Speaker of the House of Representatives of the state, and the three judges composing the court were among the ablest of our Circuit, men of wide experience and of long service on the bench. It could hardly have been intended that the findings of such men made in the course of official duty should be absolutely disregarded by the appellate court.

The property of the power company affected by the condemnation consisted of three power sites on the Hiawassee River and one on the Nottely River, a tributary of the Hiawassee. These power sites constituted the basis of an integrated power development which had been planned by the power company, with a 110-foot dam on the Hiawassee River at Appalachia near the North Carolina-Tennessee line, a 245-foot dam, designated as its Powelson dam, 12 miles up the river at the site of the present T. V. A. dam, a 200-foot dam farther up the Hiawassee near the town of Murphy, and a 200-foot dam on the Nottely across the North Carolina-Georgia line. The Murphy and Nottely developments were to be primarily for storage, and it was estimated that they would greatly increase the capacity of the Powelson development, where the storage capacity of the reservoir was limited due to the narrowness of the valley between the mountains. Likewise it was estimated that the capacity of the Appalachia plant would be greatly increased as a result of the storage resulting from the other three developments. The integrated development, with the large storage thereby made available, would enable the power company, according to its testimony, to develop 512,500,000 K.W. hours of electric energy, which it would be able to sell under contract calling for power of 35% annual load factor, i. e. under a contract providing that a very large part of the deliveries might be required during the dry months of the year. There was evidence that for power of such load fac-

tor a higher rate could be obtained than for power of a higher load factor.

The power company and its predecessors began acquiring property as a basis for this integrated development as early as 1913 and continued to do so up until 1936, when the petition herein was filed. It had successfully conducted litigation with a rival company and had established priority of right with respect to the development. Hiawassee River Power Co. v. Carolina-Tennessee Power Co., 252 U.S. 341, 40 S. Ct. 330, 64 L.Ed. 601; Carolina-Tennessee Power Co. v. Hiawassee River Power Co., 175 N.C. 668, 96 S.E. 99; Id., 171 N.C. 248, 88 S.E. 349. It had acquired the four dam sites necessary to the contemplated development, had purchased a large part of the land for the reservoirs and had done a large part of the necessary surveying and engineering. In these activities and in the acquisition of property for the development it had expended a total of $1,199,603.-27, of which $420,874.40 had been expended as the purchase price of land, $45,219 represented the expense of acquiring the land, $84,632.74 surveying expense, and $58,168.-91 engineering expense. Included also was the cost of the acquisition and development of the Murphy plant, which amounted to $295,998.73. The company had received income amounting to $137,660.74 on its investment; but, after giving credit for this, the investment in the property was $1,061,-942.53. As we have seen, the total amount awarded respondent by the court below was $1,298,080.63, and the value of the property remaining to respondent after the taking was shown to be $165,000, which makes a total of $1,363,083.63. This means that the judgment below merely gives to respondent what it has invested in the property with approximately 4% simple interest on the investment, or approximately 3% when the $100,000 for severance damages to the Murphy plant is eliminated, as for reasons hereafter stated we think it should be.

At the time of the taking, as heretofore stated, respondent owned the dam sites for the integrated four dam development which it contemplated. and had been adjudged to have priority of right with respect to making the development. For this purpose it had acquired approximately 22,000 acres of land of which 3,300 acres were above the Appalachia dam site, 12,500 above the Powelson dam site, 1,000 acres above the Murphy dam site and 4,500 acres above the

Nottely dam site. The property taken by the condemnation embraced the Powelson and Murphy dam sites with 315.9 acres in the Appalachia basin, 12,679.94 acres in the Powelson basin and 200 acres in the Murphy basin. This taking destroyed the feasibility of the four dam development contemplated by respondent and left it with 2,094.84 acres of land in the Appalachia basin, 316 acres in the Powelson basin, 619 acres in the Murphy basin, and 4,297 acres in the Nottely basin. As stated above, the court fixed the value of the property taken, other than the Murphy hydro-electric development, at $976,289.40, and the value of that development at $110,000. Consequential damages to the other lands and property, resulting from the taking, were fixed as follows:

| | |
|---|---|
| Appalachia dam and basin..... | $ 83,562.51 |
| Powelson remnant........... | 1,584.20 |
| Murphy remnant............. | 7,737.50 |
| Nottely .................... | 18,907.02 |
| Murphy transmission lines..... | 100,000.00 |

Except with respect to the consequential damages of $100,000 to transmission lines resulting from the taking of the Murphy plant, as to which we shall have more to say hereafter, the court arrived at these figures by finding that the lands which lay within the basin of the proposed Powelson development and which it was necessary to use for the ponding of water, had a value, considering their availability for water power purposes, of $200 per acre and that the other lands had a value of $10 per acre. On this basis, 4,471 acres lying within the basin of the proposed development were valued at $200 per acre and 8,208.94 acres above the basin at $10 per acre, making the total of $976,289.40.

 The evidence establishes beyond question, we think, that considering the ever-increasing demand for electric power the property did have value for water-power purposes; and this was the concurrent finding of the commissioners and the court below. There was evidence on the part of respondent, based upon estimated cost of constructing the proposed development and estimated profits to be derived therefrom, that it had a value of seven or seven and a half million dollars. We think, as did the commissioners and the court below, that this estimate of value was excessive. On the other hand, we cannot accept the testimony of petitioner's witnesses that the property had no value for power purposes and that its only value was such as it had for purposes of agriculture, stock-raising and timber production. Even if it be conceded that the property was one which could be developed profitably as a power site only by some company or governmental agency enjoying a low interest rate, its availability for such development should not be ignored in placing a value upon it, particularly where it is being acquired for the very purpose of such development. As said by the Supreme Court in Olson v. United States, 292 U.S. 246, 255, 256, 54 S.Ct. 704, 708, 78 L.Ed. 1236:

"The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. Mississippi & R. River Boom Co. v. Patterson, 98 U.S. 403, 408, 25 L.Ed. 206; Clark's Ferry Bridge Co. v. Public Service Comm., 291 U.S. 227, 54 S.Ct. 427, 78 L.Ed. 767; 2 Lewis, Eminent Domain (3d Ed.) § 707, p. 1233; 1 Nichols, Eminent Domain (2d Ed.) § 220, p. 671. The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. Nor does the fact that it may be or is being acquired by eminent domain negative consideration of availability for use in the public service. New York v. Sage, 239 U.S. 57, 61, 36 S.Ct. 25, 60 L.Ed. 143. It is common knowledge that public service corporations and others having that power frequently are actual or potential competitors not only for tracts held in single ownership but also for rights of way, locations, sites, and other areas requiring the union of numerous parcels held by different owners. And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account. [Mississippi & R. River] Boom Co. v. Patterson, ubi supra."

 As the experts of respondent placed an excessive value on the property for power purposes and the experts of the petitioner placed no value at all on it for such purposes, the court below was not bound to accept the estimates of either but was called upon to exercise its best judgment as to value on the basis of all the

facts in evidence, including evidence of other sales of property similarly situated. The rule to be followed is thus stated in Olson v. United States, supra, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236: "In respect of each item of property that value may be deemed to be the sum which, considering all the circumstances, could have been obtained for it; that is, the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining. Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 124, 44 S.Ct. 471, 68 L.Ed. 934. The determination is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof."

The court concluded, very correctly, we think, that since purchases of lands had been made by petitioner in connection with this development, it was important to see what was being paid for such lands. It appeared that petitioner had paid $396,874.79 for 9,500 acres, but that of this acreage only 1,229 acres lay within the basin of the reservoir. To acquire other lands necessary to the development including a talc mine, valued at $96,305, petitioner had paid $158,636 additional, making a total of $555,531 paid for lands other than those of respondent. In view of these prices actually paid by petitioner at or around the time of condemnation, the value fixed by the court upon the lands condemned does not appear to be excessive. It is true that a small part of the property thus purchased was town property and that some of the other had been improved and its value increased as a result of such improvement; but, on the other hand, the availability of the land for power purposes constituted its chief element of value as a whole, and it was for such purpose that it was being acquired. If a purchaser felt justified in expending $555,531 for lands to provide approximately one-fifth of the basin of the reservoir, it would not seem unreasonable to place a value of $976,289.40 upon lands which would provide not only the remainder of the basin, but also the dam site necessary to the development. Particularly is this true where the lands and dam site were held by a corporation which had acquired them for the purpose of the development, which enjoyed the right of eminent domain for that purpose and which had been adjudged to have priority of right with respect to the exercise of that power. Considering these circumstances, the award made respondent seems conservative in comparison with the prices paid for other lands. We cannot say, however, as respondent argues that we should, that it is inadequate. After all, the success of the projected development was problematical; and there is no certain testimony in the record which would justify us in adopting a higher valuation than that fixed by the court, just as there is no testimony upon which we would feel justified in fixing the valuation at a lower figure. We do not mean to say, of course, that the prices paid for other land acquired for the project furnishes any conclusive standard for the valuation of the lands of respondent. Neither does the investment made by respondent in its property. These are to be considered, however, along with the proof of the availability of the property for the development of water power and the estimates of value placed thereon by the experts.

The peculiar difficulty of the case arises out of the fact that neither the expert testimony relied upon by respondent nor that relied upon by petitioner can be accepted in its entirety in fixing values, and the other opinion evidence as to value ignores very largely the availability of the property for water power purposes. Under such circumstances, the duty devolved upon the court of determining the true value as best it could from the facts before it. In performing this duty it made an estimate of the per acre value of the lands actually available for power purposes and of those not so available; and the contention is made that because the valuations adopted by the court do not correspond to the testimony of any witness they are without support in the evidence. We are not impressed by this contention. The court was not bound to accept the opinion of any of the experts or other witnesses as to value, but was charged with the duty of determining that question from all the testimony considered in the light of the court's general knowledge. Dayton Power & Light Co. v. Public Utilities Comm., 292 U.S. 290, 299, 54 S.Ct. 647, 78 L.Ed. 1267; The Conqueror, 166 U.S. 110, 131, 133, 17 S. Ct. 510, 41 L.Ed. 937; Head v. Hargrave,

105 U.S. 45, 49, 26 L.Ed. 1028; Anchor Co. v. Com'r, 4 Cir., 42 F.2d 99, 100; Bourne v. Com'r, 4 Cir., 62 F.2d 648, 650; Gamble v. Com'r, 6 Cir., 101 F.2d 565, 567. What was said by Mr. Justice Field in Head v. Hargrave, supra, as to the duty of the jury with respect to expert testimony as to value, is applicable to the duty of the court here. Said he [105 U.S. 49, 26 L.Ed. 1028]: "The evidence of experts as to the value of professional services does not differ, in principle, from such evidence as to the value of labor in other departments of business, or as to the value of property. So far from laying aside their own general knowledge and ideas, the jury should have applied that knowledge and those ideas to the matters of fact in evidence in determining the weight to be given to the opinions expressed; and it was only in that way that they could arrive at a just conclusion. While they cannot act in any case upon particular facts material to its disposition resting in their private knowledge, but should be governed by the evidence adduced, they may, and to act intelligently they must, judge of the weight and force of that evidence by their own general knowledge of the subject of inquiry."

That the court estimated the value upon an acreage basis rather than in a lump sum is immaterial, if all elements of value were considered, as the opinion of the court shows that they were. The valuation by the acre made possible a proper differentiation between lands which actually had value for water power purposes and those which did not have such value; and upon the whole evidence the valuation fixed by the court impresses us as being what is reasonable and right in the premises. Petitioner is taking from respondent property which had been acquired for water power development for the purpose of making the development itself. The property unquestionably has value for that purpose. The amount awarded appears conservative when compared with what has been paid for other lands acquired in the same basin for that purpose and, with the severance or consequential damage, returns to the respondent no more than its investment in the property with approximately 3% interest on the investment. Of course, it is market value and not investment which must be considered in determining compensation, but investment is one of the elements to be considered in passing upon market value. It is an element which un-

doubtedly would be brought forward and given substantial weight in any bargaining between "an owner willing to sell and a purchaser desiring to buy", and one from which the value of the property can be more accurately judged than from the opinion of experts based upon theories of development.

The same reasoning holds as to the use of the $200 and $10 per acre valuations in computing consequential or severance damages other than with respect to the Murphy transmission lines. The taking of the Powelson and Murphy dam sites and the other lands necessary for petitioner's reservoir destroyed the possibility of the integrated four dam development contemplated by respondent and depreciated the value of the lands not taken which respondent had acquired for that purpose. As said by the court below [33 F.Supp. 519, 525]: "Since the taking of the 12,679.94 acres which included the dam site and basin of the contemplated Powelson dam, it is impossible for the respondent, Southern States Power Company, to use its remaining property as the site of an integrated hydroelectric power system. Its principal dam site and holdings, located in the centre of its property, are taken, and the remainder cannot be developed as an integrated system so that the dam upstream can store water during rainy seasons and release same into the proposed lakes or ponds downstream during dry seasons. The status of all of said property as the site of a four-dam integrated hydroelectric power system has been destroyed, and what is left the respondent, in its remnants of property not taken, has been reduced to the status of farm lands and rough mountain acreage."

It is argued that the severance or consequential damages as to the Appalachia, Murphy and Nottely lands cannot be allowed because these lands are not contiguous to the lands taken. It is clear from the record, however, that they were acquired by respondent for the purposes of an integrated development to which they were necessary; and when that development was frustrated by the taking of the Powelson dam site and basin lands, the award of such damages was necessary to reimburse the owner for the damage sustained as a result of the taking. The case is unusual, but is analogous to that presented where a part only of a single tract of

land is taken and recovery of resulting damage to the remainder is allowed. See United States v. Grizzard, 219 U.S. 180, 183, 31 S.Ct. 162, 55 L.Ed. 165, 31 L.R.A., N.S., 1135; 18 A.J. 905; 20 C.J. 731. The controlling principle is that the owner is entitled to full compensation for the taking of his land and all its consequences. He is, of course, no more entitled to damages to an entirely separate and disconnected property than if the damages thereto had resulted from the taking of the property of another; but here the unitary character of respondent's projected enterprise bound the various tracts together for the purposes of applying the rule just as completely as if they had been embraced within one boundary, which, after all, is an entirely artificial thing. Respondent was entitled, upon the taking of a part of the lands acquired for that enterprise, "to have the just compensation safeguarded by the Fifth Amendment to the Constitution; that is, the value of the land taken and damages inflicted by the taking—such a sum as would put him in as good a position pecuniarily as he would have been if his property had not been taken". Campbell v. United States, 266 U.S. 368, 371, 45 S.Ct. 115, 116, 69 L. Ed. 328.

■ The rule is that, even where lands are contiguous, the owner is not ordinarily entitled to damages accruing to tracts which are separate and distinct from the lands taken. 20 C.J. 735. "If, however, several contiguous lots or tracts in reality constitute an entire parcel used for one general purpose by the common owner, the inquiry should embrace all injuries which will be caused to the entire body of the land." 20 C.J. 735, 736. The rule applicable in such cases was well stated by Judge Gray, speaking for the Circuit Court of Appeals of the Third Circuit in Sharpe v. United States, 112 F. 893, 896, 57 L.R.A. 932, affirmed 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211: "It is not denied that in rendering the 'just compensation' secured by the constitution of the United States to the citizen whose property is taken for public uses it is right and proper to include the damages in the shape of deterioration in value which will result to the residue of the tract from the occupation of the part so taken. In applying this rule, however, regard is had to the integrity of the tract *as a unitary holding by the owner*. The holding from which a part is taken for public uses must be of such a character as

that its integrity as an individual tract shall have been destroyed by the taking. Depreciation in the value of the residue of such a tract may properly be considered as allowable damages in adjusting the compensation to be given to the owner for the land taken. It is often difficult, when part of a tract is taken, to determine what is a distinct and independent tract; but the character of the holding, and the distinction between a residue of a tract whose integrity is destoyed by the taking and what are merely other parcels or holdings of the same owner, must be kept in mind in the practical application of the requirement to render just compensation for property taken for public uses. How it is applied must largely depend upon the facts of the particular case and the sound discretion of the court." (Italics supplied).

See, also, Potts v. Pennsylvania, etc., R. Co., 119 Pa. 278, 13 A. 291, 4 Am.St.Rep. 646; note 85 Am.St.Rep. at page 300.

■ As to the item of $100,000 severance damages with respect to the Murphy transmission lines, we are of opinion that the allowance of this item was erroneous. The testimony of Mr. Powelson is that the value of the Murphy plant and distribution system after allowing depreciation was $200,000. (Pet. Appendix 144.) $110,000 was fixed as the value of this plant and the court found that the value of the distribution system after the taking was $90,000. This clearly indicates that the value of the transmission lines which were abandoned was included in the $110,000 fixed as the value of the Murphy plant. This was the testimony of the witness Vanderhoof. (Transcript 2963, 2964, 4495, 4496.) The error of the court below seems to have arisen from valuing the plant and distribution system at $300,000. That this is erroneous is clearly indicated by the following testimony of Mr. Powelson: "Now, I am left with my figure of $264,000 as the value of the property, after the complete taking in these proceedings, with $100,000 representing the value of the Murphy distribution system at the time we got it, and the additions which we have made thereto, which have cost us $64,000. There has been some depreciation upon the property. I have taken that into consideration, and I have fixed, in my own mind, as reasonable and fair, that that distribution system would be valued at $100,000, and that the Murphy generating plant would be valued at $100,000, and that made the $364,000 that

I first mentioned. Then, I have taken out of those figures $100,000 for the Murphy electric plant as being the value, after these proceedings are entirely completed, and titles have passed, and that leaves $264,-000."

It is argued that this testimony was later corrected by Mr. Powelson, who testified that $99,000 bonds were outstanding against the Murphy plant and distribution system, so that the value of the property remaining in respondent after the taking was $165,-000 instead of $264,000. This is true; but the correction does not affect the valuation of the physical property to which the witness had testified. It means merely that that property was subject to an incumbrance.

We think further that the agreement of the parties precludes respondent from asking recovery of severance damages for the taking of the Murphy plant, and shows that the entire damage resulting from that taking was included in the $110,-000 upon which the parties had agreed. The applicable provisions of the stipulation were as follows:

"That the petitioner and respondents Southern States Power Company hereby withdraw their exceptions to the award in the sum of one hundred ten thousand ($110,000) dollars made by the commissioners herein to Southern States Power Company and the Town of Murphy for the hydroelectric power plant built by said Town of Murphy and located on the Nottely River and the petitioner agrees forthwith to pay into the Court a sum sufficient to increase the amount deposited for this property to one hundred ten thousand ($110,000) dollars, which total sum the petitioner agrees may be paid to Southern States Power Comany, and the petitioner shall not be liable for any further sum for the taking of this plant, except as in the next paragraph provided.

"That the question of the rate of interest on said sum of one hundred ten thousand ($110,000) dollars and the period for which interest thereon shall be paid to Southern States Power Company is reserved for future determination by this Court."

Severance damages with respect to the transmission lines is clearly part of the liability for the taking of the plant; and the agreement is that, after the payment of the $110,000, "petitioner shall not be liable for any further sum for the taking of this plant,

except as in the next paragraph provided." The only exception provided by the next paragraph is that the rate of interest and the period for which interest shall run on the $110,000 is reserved for future determination. Under the rule expressio unius est exclusio alterius, this reservation of questions as to interest precludes the reservation of questions as to severance damages resulting from the taking.

The interest awarded by the court below was based upon the theory that upon the filing of the petition for condemnation on January 28, 1936, respondent's project was frustrated and consequential damage at once accrued as to the property not then condemned. As said by the court below: "By the first taking on January 28, 1936, the shoal and Powelson dam site was taken and the entire property of the Southern States Power Company was robbed of the value it possessed as the site of an integrated hydroelectric power system." We think that this is so manifestly correct as not to justify further discussion. We do not understand that complaint is made of the manner in which the court has applied this principle with respect to interest either on the value of property taken or on severance damages; and a careful examination of the judgment convinces us that it has been correctly applied.

A question arises with respect to the award of $18,907.02 as damages to the Nottely property. The title to this property was held by a subsidiary corporation of the power company, all of whose stock was owned by that company. The property, moreover, is not situate within the state of North Carolina, where the property taken lies, but across the state line in Georgia. As to the location of the property, we do not think that the fact that it lies in another state precludes the award of damages with respect to it, where such damages result from the taking of land lying in the state of the forum. As heretofore stated, the Nottely land formed a part of the unitary enterprise for which the property of the power company had been acquired, and that company was entitled, upon the taking of a part of the property, to recover the total damage sustained from the taking, including the damage resulting to the remainder of the property not taken. The fact that a portion of the remainder might lie in another state ought not preclude a recovery necessary to adequate compensation. Cf. Atchison & N. R. Co.

v. Gough, 29 Kan. 94; note 57 L.R.A. at page 948.

 The fact that title is held by a subsidiary corporation, all of whose stock is owned by the power company, should not preclude recovery; for the damage falls upon the power company through depreciation in the value of the stock, just as clearly as if title were held by it. If the subsidiary corporation holding the title were made a party to the suit, therefore, it would be proper to award to the power company damages with respect to this property held for it as a part of a unitary enterprise. The case presented would clearly be one where the court should look through form to substance and disregard the corporate entity of the holding corporation in the interest of substantial justice, particularly since any damage to the Nottely lands would be mirrored in the depreciation in value of its stock held by the power company. Taylor v. Standard Gas & Electric Co., 10 Cir., 96 F.2d 693, at page 706; Centmont Corp. v. Marsch, 1 Cir., 68 F.2d 460; New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348; Industrial Cotton Mills v. Com'r, 4 Cir., 61 F.2d 291; Consolidated Indiana Coal Co. v. National Bituminous Coal Comm., 7 Cir., 103 F.2d 124. We cannot ignore, however, the fact that title to the lands is in the subsidiary corporation. Cleveland Trust Co. v. Consolidated Gas, E. L. & P. Co., 4 Cir., 55 F.2d 211; and before the respondent is permitted to receive the award made on account of these lands, that corporation should be made a party to this proceeding so that it will be bound by the judgment.

The judgment appealed from will accordingly be modified by excluding therefrom the allowance of $100,000 severance damages for the taking of the Murphy plant with interest on that amount. As to the award of $18,902.02 as °damages to the Nottely property, the judgment appealed from will be affirmed if within thirty days from the date the mandate is filed in the District Court the Union Power Company, the subsidiary of the Southern States Power Company, shall make itself a party to the cause in such way as to be bound by the judgment; otherwise the judgment shall be modified by eliminating therefrom this item of $18,902.02 with the interest allowed thereon. In other respects the judgment appealed from will be affirmed.

Modified.